# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 2, 2016            Decided March 4, 2016

No. 14-5223

GEORGE B. KEEPSEAGLE, ET AL.,
APPELLEES

TIMOTHY LABATTE,
APPELLANT

v.

THOMAS J. VILSACK, SECRETARY OF AGRICULTURE,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:99-cv-03119)

———

*Erick G. Kaardal* argued the cause and filed the briefs for appellant.

*Carleen M. Zubrzycki*, Attorney, U.S. Department of Justice, argued the cause for appellee. On the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Vincent H. Cohen Jr.*, Acting U.S. Attorney, and *Charles W. Scarborough* and *Katherine Twomey Allen*, Attorneys.

Before: BROWN, PILLARD, and WILKINS, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:  Appellant Timothy LaBatte, a class member in a class action against the United States Department of Agriculture ("USDA"), seeks to intervene in that class action – despite the fact that the action was settled and closed – after his claim for compensation under the terms of the action's settlement agreement was denied.  We affirm the District Court's determination that it lacked ancillary jurisdiction to hear Labatte's challenge.  We do so because LaBatte's motion to intervene is unrelated to the underlying lawsuit and because the District Court was not required to hear LaBatte's motion in order to effectuate its decrees.

## I.

## A.

The instant litigation stems from a class action filed in 1999, alleging that the USDA discriminated against Native American farmers in its provision of loans.  The parties settled the action in November 2010.  The District Court approved the settlement, and dismissed the suit with prejudice in April 2011, stating that it "retain[ed] continuing jurisdiction for a period of five years . . . for the limited purposes set forth in . . . the Settlement Agreement."  Final Order and Judgment, Keepseagle v. Vilsack, No. 99-CV-3119 (D.D.C. 2011), ECF No. 607, J.A. 63.

The Settlement Agreement ("Agreement") created two tracks for recovery, Track A and Track B, each of which allowed for different amounts of damages based on different burdens of proof.  Relevant here, Track B required a class claimant to establish, by a preponderance of the evidence, a number of factual points, including that (1) the claimant

applied for a loan with the USDA and was denied, given less than she asked for, or given unfavorable terms; and (2) that the treatment the claimant received from the USDA was "less favorable than that accorded a specifically identified, similarly situated white farmer(s)." Revised Settlement Agreement § IX.D.1.e, J.A. 126. Claimants were permitted to meet their evidentiary burden as to the "similarly situated white farmer" by providing a "credible sworn statement based on personal knowledge by an individual who is not a member of the Claimant's family." *Id.* § IX.D.2.a, J.A. 127.

The Agreement provided for a "Non-Judicial Claims Process," *id.* § IX, J.A. 116, whereby each claimant's claim would be processed by a Claims Administrator, *id.* § IX.B, J.A. 121-23, and reviewed by a third-party claims adjudication company (termed a "Neutral"), *id.* § IX.B.7, J.A. 123, whose role was to "determine the merits of the claims submitted" under either Track A or Track B, *id.* §§ II.OO, II.AAA, J.A. 108, 110. The Agreement stated that the final determinations of these Neutrals are not reviewable:

> The Claim Determinations, and any other determinations made under this Non-Judicial Claims Process are final and are not reviewable by the Claims Administrator, the Track A Neutral, the Track B Neutral, the District Court, or any other party or body, judicial or otherwise. The Class Representatives and the Class agree to forever and finally waive any right to seek review of the Claim Determinations, and any other determinations made under this Non-Judicial Claims Process.

*Id.* § IX.A.9, J.A. 120.

The Agreement also specified the precise – and limited – contours of the District Court's jurisdiction over the Agreement going forward. It stated that "[t]he Court shall retain jurisdiction over this action beyond the date of final approval of this Agreement *only* as set forth below." *Id.* § XIII.A,[1] J.A. 141 (emphasis added). The Agreement then specified five areas of continuing jurisdiction, only one of which is relevant to the instant case:

> **Non-Judicial Claims Process**. The Court shall retain jurisdiction over this action to supervise the distribution of the Fund . . . . This continuing jurisdiction will continue until final payment from the Fund . . . .

*Id.* § XIII.A.1, J.A. 141-42. This portion of the Agreement mentions nothing about the decisions of the Claim Administrator or the Track A or B Neutral and therefore confers on the District Court no jurisdiction over those determinations. After listing these narrow areas where the Court retains jurisdiction, the Agreement reiterates that "[o]ther than the provisions expressly described above . . . , the Court will not retain jurisdiction over any aspect of this action, or in connection with the enforcement of any of its provisions, after the date of the final approval of this Agreement." *Id.* § XIII.A, J.A. 143.

---

[1] The revised Agreement erroneously renumbered many of the agreement's sections and sub-sections. For instance, what should be numbered as Section XIII.A.1, is numbered as Section V.A.7, despite the fact that it is the thirteenth section in the Agreement, and the first, not seventh, sub-sub-section. Section V already exists earlier in the agreement. *Compare* J.A. 111, *with* J.A. 141. This opinion retains the original, correct section numbering, which was used in the original Agreement, *see* J.A. 47, and is also reflected in the table of contents to the revised Agreement, *see* J.A. 100-01.

The Agreement also sets forth the process a claimant must follow to enforce the Agreement. It notes initially that a claimant can seek an order asking the District Court to enforce the Agreement, but only concerning an "alleged violation of the provisions of th[e] Settlement Agreement *that are enforceable by the Court*." *Id.* § XIII.B, J.A. 143 (emphasis added). To do so, however, the claimant must first serve the opposing party with a written notice "that describes with particularity the term(s) of the Settlement Agreement that are alleged to have been violated, the specific errors or omissions upon which the alleged violation is based, and the corrective action sought." *Id.* § XIII.B.1, J.A. 143. The opposing party then has 45 days to respond to the notice. *Id.* § XIII.B.2, J.A. 143. If that party fails to respond, or the parties are unable to resolve their dispute, the claimant may then move the Court to enforce "the provisions of th[e] Settlement Agreement that are enforceable by the Court." *Id.*

**B.**

To file a claim, LaBatte recognized that he needed to find at least one witness who could submit a declaration on his behalf stating that similarly situated white farmers received better treatment from the USDA than did LaBatte. LaBatte claims that he found two such witnesses: Russell Hawkins and Tim Lake. Both individuals currently work for the Bureau of Indian Affairs ("BIA"). LaBatte alleges that after he spoke with both witnesses and drew up their declarations, the Government prohibited Hawkins and Lake from signing them.

LaBatte filed his claim under the Agreement in December 2011, via Track B. Because he lacked signed declarations attesting to similarly situated white farmers, LaBatte submitted the declarations that Hawkins and Lake

allegedly would have signed, along with an additional declaration from his attorney explaining that the BIA prohibited Hawkins and Lake from signing the declarations.

The Track B Neutral rejected LaBatte's claim, stating that LaBatte "failed to satisfy the requirement of the Settlement Agreement, through a sworn statement, that named white farmers who are similarly situated to [LaBatte] received USDA loans . . . that w[ere] denied to [LaBatte]." J.A. 155. The Neutral specifically found the unsigned declarations, along with LaBatte's attorney's declaration accusing the Government of interfering with LaBatte's claim, to be inadequate. *Id.* at 155-56.

## C.

After receiving his rejection notice, LaBatte attempted to follow the requirements of the Agreement by serving the Government with a written notice alleging that, by prohibiting Hawkins and Lake from signing LaBatte's declarations, the Government impermissibly interfered with the *Keepseagle* claims process. In doing so, LaBatte alleged, the Government breached the "covenant of good faith and fair dealing" implied in the Agreement. *See* J.A. 157-60. His notice did not otherwise accuse the Government of violating any particular provision in the Agreement.

The Government never responded to LaBatte's notice. After waiting the appropriate amount of time, LaBatte filed a "complaint in intervention," which the District Court treated as a motion to intervene. He alleged that the Government had breached the Agreement, Compl. ¶¶ 191-215, had violated his due process and First Amendment rights, *id.* ¶¶ 216-45, and had violated the Equal Credit Opportunity Act and the Administrative Procedure Act, *id.* ¶¶ 254-59. He also sought a declaratory judgment finding that the Government rendered

the Agreement's Track B process "illusory," and had otherwise violated LaBatte's constitutional and other rights. *Id.* ¶¶ 183-90, 246-53.

The District Court held that it lacked jurisdiction to hear LaBatte's motion. Because the Court had dismissed the case with prejudice following settlement, it determined that it was only through its ancillary jurisdiction that it could hear LaBatte's motion. Memorandum Order at 7-8, Keepseagle v. Vilsack, No. 99-CV-3119 (D.D.C. 2014), ECF No. 692, J.A. 239-40. Relying on the fact that the Court had retained jurisdiction over the case only in very limited areas, none of which applied to LaBatte's motion, it found that LaBatte had failed to establish that the Court had ancillary jurisdiction over his motion. *Id.* at 8-10, J.A. 240-42.

LaBatte now seeks our review of the District Court's determination.

## II.

Because "[f]ederal courts are courts of limited jurisdiction," "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted). The doctrine of "ancillary jurisdiction" "recognizes [that] federal courts[] [have] jurisdiction over some matters (otherwise beyond their competence) that are incidental to other matters properly before them." *Id.* at 378. The Supreme Court has defined two separate purposes for which courts may assert ancillary jurisdiction: "(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its

authority, and effectuate its decrees." *Id.* at 379-80 (internal citations omitted).

Interpreting *Kokkonen* as it pertains to settlement agreements, we have explained that "district courts enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees, but are instead constrained by the terms of the decree and related order." *Pigford v. Veneman* (*Pigford I*), 292 F.3d 918, 924 (D.C. Cir. 2002); *accord Pigford v. Vilsack* (*Pigford II*), 777 F.3d 509, 514 (D.C. Cir. 2015) ("While it may be a 'well-established principle . . . that a district court retains jurisdiction under federal law to enforce its consent decree[s],' it retains this authority only if the parties' agreement or the court order dismissing the action reserves jurisdiction to enforce compliance." (quoting *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 286 (D.C. Cir. 1993)) (citing *Kokkonen*, 511 U.S. at 381)).

"We review a district court decision interpreting a consent decree and any underlying agreement *de novo*." *Pigford II*, 777 F.3d at 513. "We review the denial of a motion to intervene *de novo* for issues of law, for clear error as to findings of fact and for abuse of discretion on issues that involve a measure of judicial discretion." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1322 (D.C. Cir. 2013) (internal quotation marks omitted).

### III.

The District Court correctly applied *Kokkonen* and determined that it did not have jurisdiction to hear LaBatte's claim. LaBatte's claim is not "factually interdependent" with the *Keepseagle* class action itself, nor would the District Court's consideration of LaBatte's claim enable the Court to "effectuate its decrees."

9

**A.**

LaBatte first argues that the "distribution of the Settlement Fund and a right to non-government interference with the Track B process . . . are interrelated and *interdependent* to the claims LaBatte asserted in his complaint." Principal Br. of Appellant at 37 (emphasis in original). His argument misapplies *Kokkonen*'s first prong. Whether his claim is factually interdependent with the Agreement that stemmed from that class action is irrelevant to *Kokkonen*'s first prong. What matters is that LaBatte's claim is not factually interdependent with the underlying *Keepseagle* class action.

In *Kokkonen*, the parties settled a suit that involved the alleged breach of a "general agency agreement." 511 U.S. at 376. After a disagreement over the parties' obligations under the settlement, the defendant brought suit asking the District Court to enforce the settlement. *Id.* at 377. Assessing what it had established as the first ancillary jurisdiction prong, the Supreme Court held that the defendant failed to establish jurisdiction because "the facts underlying respondent's dismissed claim for breach of agency agreement and those underlying its claim for breach of settlement agreement have nothing to do with each other; it would neither be necessary nor even particularly efficient that they be adjudicated together." *Id.* at 380.

The same can be said for the instant case. Although the *Keepseagle* class action generated the Agreement, the operation of which is contested in this suit, the facts of the two actions are not "interdependent." LaBatte's claim that the Government interfered with his ability to file properly a claim pursuant to the *Keepseagle* Agreement has nothing to do with the facts underlying the *Keepseagle* class action, which

involved discrimination in providing loans to Native American farmers. As in *Kokkonen*, there would be no advantage to or logic in adjudicating the two disputes together.

Thus, LaBatte cannot establish ancillary jurisdiction under *Kokkonen*'s first prong.

**B.**

LaBatte fares no better under *Kokkonen*'s second prong: whether hearing LaBatte's motion would "enable [the] court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Id.* Because courts retain jurisdiction over a settlement such as the one at issue here "only if the parties' agreement or the court order dismissing the action reserves jurisdiction to enforce compliance," *Pigford II*, 777 F.3d at 514, *Kokkonen*'s second prong applies only if the District Court in this case retained the authority to enforce the portion of the Agreement that LaBatte alleges the Government violated – namely, the Track B decisionmaking process. *See* Compl. ¶ 185 (alleging that the Government "interfered and denied LaBatte a Track B process by instructing Hawkins and Lake as BIA employees not to sign the prepared declarations.").

LaBatte argues that the District Court did retain such authority, focusing on the provision in the Agreement that provided the District Court with jurisdiction over "the distribution of the Fund." Revised Settlement Agreement § XIII.A.1, J.A. 141. He claims that by interfering with LaBatte's ability to prove his claim, the Government disrupted the Track B process generally, which affected the distribution of funds. *See* Principal Br. of Appellant at 38 ("The process of distribution included the Track B process. There is no distribution without a process . . . .").

However, LaBatte's understanding of the meaning behind "distribution of funds" runs counter to the use of the term "distribute" (or its variations) in the remainder of the Agreement. For instance, section IX.F.8 describes post-determination procedures for dispending funds to successful claimants. *See* J.A. 134 ("All checks *distributed* under this Section . . . will be valid for 180 calendar days from the date of issue." (emphasis added)). Similarly, section X.A.5 notes that class counsel must provide information to class members "regarding the status of claims processing *or* the distribution of funds," J.A. 135 (emphasis added), clearly distinguishing the one from the other. In both instances, the notion of "distribution" concerns only processes that take place after the claims determination process. *See also id.* § XII.E.1, J.A. 140 (describing "the distribution of a Debt Relief Award" as being separate from "the Claims Determination").

Additionally, LaBatte's argument fails to account for the Agreement's strong finality language declaring all claim determinations final and unreviewable. *See* Revised Settlement Agreement § IX.A.9, J.A. 120 ("The Claim Determinations, and any other determinations made under this Non-Judicial Claims Process are final and are not reviewable by the Claims Administrator, the Track A Neutral, the Track B Neutral, the District Court, or any other party or body, judicial or otherwise."); *id.* § II.C, J.A. 102 (defining "Claim Determination" as "the binding and final result of a Track A or Track B adjudication [that] represents whether a Class Member is eligible to receive an award as a result of the Non-Judicial Claims Process, and if so, the amount of the award"). The Agreement's determination that the District Court would maintain continuing jurisdiction over "the distribution of the Fund" must be interpreted in light of such finality language. *See Pigford II*, 777 F.3d 514-15 ("The Consent Decree, as a written reflection of the parties' bargain resolving their case,

should be interpreted as a contract."); *Pigford I*, 292 F.3d at 924 (holding that "an enforcement clause limited by its plain language" to only certain kinds of enforcement disputes does not confer ancillary jurisdiction over disputes that extend beyond that limiting language).

Following LaBatte's argument to its logical conclusion would write the finality provision out of the Agreement almost entirely. If any dispute concerning the Track B process is, in essence, a dispute concerning the distribution of funds because "[t]here is no distribution without a process," Principal Br. of Appellant at 38, then the entire non-judicial claims process would be open to judicial review (whether Track A or Track B), a result in direct contravention to the finality provision. Given the explicit terms circumscribing the Court's jurisdiction, such an interpretation of fund distribution would run counter to the intent of the parties in entering into the Agreement.

LaBatte's reliance on our decision in *Pigford II* is no more helpful. In *Pigford II*, a claimant, McGiniss, sought to pursue his claim under the Track B process, but his claim was mistakenly and finally reviewed under the Track A process, which resulted in him receiving less money from the settlement than he might have otherwise. 777 F.3d at 512-13. According to the consent decree in that case, a "facilitator" was supposed to send Track A claims to an "adjudicator" and Track B claims to an "arbitrator." *Id.* at 511. As in the instant case, the consent decree there also included a finality provision, stating that "decisions of the adjudicator and arbitrator are 'final' . . . and the parties consent 'to forever waive their right to seek review in any court' of 'any claim that is, or could have been[,] decided by the adjudicator or arbitrator.'" *Id.* at 511-12 (quoting from the consent decree). Unlike the settlement here, however, the consent decree

provided the District Court with much broader continuing jurisdiction, stating that the District Court would retain jurisdiction "to issue orders 'concerning the alleged violation of any provision'" of the consent decree. *Id.* at 511 (quoting from the consent decree). Because the *Pigford II* consent decree required the facilitator to send Track A claims to the adjudicator and Track B claims to the arbitrator, we explained that the facilitator had failed to comply with the consent decree when it sent McGinnis's Track B claim to an adjudicator. *Id.* at 514. Accordingly, we held that by correcting the facilitator's error, "the District Court did no more than enforce the parties' agreement," as it had jurisdiction to do under the language of the consent decree. *Id.*

The instant case differs from *Pigford II* in two important ways. First, the consent decree in *Pigford II* provided the District Court with much broader jurisdiction over the enforcement of the settlement generally: jurisdiction over any violation of any provision in the consent decree. Thus, our focus on conduct antecedent to the rejection of McGinnis's claim (namely, the facilitator's erroneous transfer of McGinnis's claim to a Track A adjudicator, instead of a Track B arbitrator) was warranted because the Court's jurisdiction there was defined in such a way that, so long as it did not involve the finality of claim determinations, the Court could seemingly hear any other dispute over a violation of the consent decree. In the instant case, however, the jurisdiction retained by the District Court was much narrower. There is nothing in the *Keepseagle* Agreement that confers jurisdiction on the District Court unless the conduct at issue involves one of the specified, narrow ways in which the Court maintained jurisdiction, such as over the distribution of the settlement fund.

Second, the finality bar in the *Pigford II* agreement conflicted with the agreement's broad enforcement provision. In the circumstances of that case, the contradiction could be reconciled by reference to "the parties' purpose in rendering adjudicator decisions final" to enforce the facilitator's correct tracking of claims, which entailed no review of any final adjudicator or arbitrator decision. *Id.* at 515. No such contradiction exists here. The District Court's jurisdiction is drawn exceedingly narrowly, and, as relevant here, exists only as to matters concerning the distribution of the settlement fund. There is no explicit and direct conflict between such matters and claim determinations. Funds are distributed only after claim determinations have been made, and that distribution is therefore separate from the claim determination process.

Accordingly, LaBatte cannot establish ancillary jurisdiction under *Kokkonen*'s second prong.

## C.

None of LaBatte's remaining arguments is persuasive. LaBatte claims that the District Court erred because it was required to determine whether the USDA breached the Agreement before it determined whether it had ancillary jurisdiction. However, LaBatte did not raise this argument below, and therefore it is forfeited. *See Benoit v. USDA*, 608 F.3d 17, 21 (D.C. Cir. 2010).

LaBatte also claims that the Government's interference with LaBatte's declarations constitutes spoliation. The District Court refused to consider the argument below because LaBatte "never explained how these allegations, if true, create jurisdiction." Memorandum Order at 11, Keepseagle v. Vilsack, No. 99-CV-3119 (D.D.C. 2014), ECF No. 692, J.A. 243. On appeal, LaBatte makes the same mistake. He never

explains how his spoliation argument is at all relevant to the Court's jurisdiction. It is axiomatic that a court must have jurisdiction before it can hear any argument on the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95, 101-02 (1998).

\*\*\*

For the foregoing reasons, we affirm the District Court's judgment.

*So ordered.*