# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 12, 2019          Decided February 14, 2020

No. 19-5131

GOVERNMENT OF GUAM,
APPELLEE

v.

UNITED STATES OF AMERICA,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02487)

*Rachel Heron*, Attorney, U.S. Department of Justice, argued the cause for appellant United States of America. With her on the briefs were *Eric Grant*, Deputy Assistant Attorney General, and *Evelyn Ying* and *Michael Augustini*, Attorneys.

*John D.S. Gilmour* argued the cause for plaintiff-appellee. With him on the brief were *Bezalel A. Stern*, *William J. Jackson*, and *Mark Donatiello*. *Fabio Dworschak* entered an appearance.

Before: HENDERSON and TATEL, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: For nearly half a century, the United States Navy operated a landfill on the island of Guam. Home to discarded munitions, chemicals, and everyday garbage, the so-called Ordot Dump lacked any sort of environmental safeguards. At bottom, this case concerns whether Guam or the Navy is financially responsible for the environmental hazards arising from the Ordot Dump. The answer to that question turns on the interaction between two provisions of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA): section 107, the act's "cost-recovery" provision, and section 113, its "contribution" provision. *See* 42 U.S.C. §§ 9607, 9613(f). If Guam must proceed under section 113, then its suit against the Navy for costs related to the dump is now time-barred. But if it may utilize section 107, then its suit remains timely. As explained below, we conclude that a 2004 consent decree with EPA triggered Guam's right to pursue a contribution claim under section 113, precluding it from now pursuing a claim under section 107. We therefore reverse the district court's contrary conclusion and remand with instructions to dismiss.

## I.

Congress enacted CERCLA, 42 U.S.C. §§ 9601 et seq., "in response to the serious environmental and health risks posed by industrial pollution," *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). Seeking to enable the "prompt cleanup of hazardous waste sites and to ensure that responsible parties foot the bill," *General Electric Co. v. Jackson*, 610 F.3d 110, 114 (D.C. Cir. 2010), CERCLA directs that any potentially responsible party— "PRP" for short—"shall be liable" for the costs associated with the release of hazardous substances and subsequent cleanup of polluted sites, CERCLA § 107(a).

Remediation at Superfund sites is, unsurprisingly, expensive. Central to CERCLA's operation is a mechanism for entities to seek recoupment of any cleanup costs incurred from other responsible parties. As originally drafted, CERCLA provided that "any person" potentially responsible for hazardous waste "shall be liable for . . . all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe," CERCLA § 107(a)(4)(A), as well as "any other *necessary costs of response incurred* by any other person," *id*. § 107(a)(4)(B) (emphasis added). While CERCLA "did not mandate 'joint and several' liability in every case," *Burlington Northern & Santa Fe Railway Co. v. United States*, 556 U.S. 599, 613 (2009), "[t]he practical effect of placing the burden on defendants has been that responsible parties rarely escape joint and several liability," *O'Neil v. Picillo*, 883 F.2d 176, 178–79 (1st Cir. 1989), meaning that any one PRP may be held responsible for the entire cost of a cleanup.

Although multiple entities may be responsible for a superfund site, only one may have actually "incurred" "costs of response"—a necessary predicate to bringing a section 107 claim. CERCLA § 107(a)(4)(A), (B). Following CERCLA's passage in 1980, "litigation arose over whether § 107, in addition to allowing the Government and certain private parties to recover costs from PRPs, also allowed a PRP that had incurred response costs"—that is, a PRP that had paid out but not actually done a cleanup itself—"to recover costs from other PRPs." *Cooper Industries, Inc. v. Aviall Services, Inc*., 543 U.S. 157, 161 (2004). At common law, tortfeasors like PRPs were typically entitled to "contribution"—a "right to collect from joint tortfeasors when, and to the extent that, the tortfeasor has paid more than his or her proportionate share to the injured party, the shares being determined as percentages of causal fault." *Contribution*, Black's Law Dictionary (11th ed. 2019). But as originally passed, "CERCLA contained no provision

expressly providing for a right of action for contribution;" in fact, it made no mention of "contribution" at all. *Cooper*, 543 U.S. at 162.

Congress addressed this gap in the statutory scheme when it amended CERCLA through the Superfund Amendments and Reauthorization Act of 1986, Pub. L. 99–499, 100 Stat. 1613. Specifically, it added a new section to the Act—section 113— which "provide[d] two express avenues for contribution." *Cooper*, 543 U.S. at 167. The first, section 113(f)(1), provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section [107(a)] of this title, during or following any civil action . . . under section [107(a)] of this title." CERCLA § 113(f)(1). The second new avenue, section 113(f)(3)(B), provides that a party that "has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement." Section 113 also creates special incentives for PRPs to settle with enforcement authorities. Although that section broadly allows PRPs to seek contribution from other PRPs, "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." *Id.* § 113(f)(2). Settlement with EPA or state authorities therefore inoculates a party from further contribution liability.

The upshot is that CERCLA now offers two potential causes of action for an entity seeking recovery from a PRP: a section 107 "cost-recovery" action, available for recoupment of cleanup costs, and a section 113(f) "contribution" action, available for recoupment of funds paid out pursuant to a section 107 action, a settlement, or another contribution action. Central

to this case, the statute of limitations for a contribution action is three years, *see* CERCLA § 113(g)(3); the statute of limitations for a remedial section 107 action is six, *id.* § 113(g)(2)(B).

## II.

Nearly a century before CERCLA's passage, the United States captured the island of Guam following the Spanish-American War. *See* Paul Carano & Pedro C. Sanchez, *A Complete History of Guam* 169–83 (1964) (describing how Guam became an American possession). From 1903 until World War II, the United States treated Guam as a US Naval ship—the "USS Guam"—and maintained military rule until the passage of the Guam Organic Act in 1950. Robert F. Rogers, *Destiny's Landfall: A History of Guam* 126, 226 (1995). That act marked the formal transfer of power from the United States to Guam's newly formed civilian government, *id.* at 226, but until the 1960s, visiting Guam required a military security clearance, *see* Exec. Order No. 11045, 3 C.F.R. 238, 238–39 (1962) (discontinuing the Guam Island Naval Defensive Sea Area and Guam Island Naval Airspace Reservation). Guam remained, as it had been since the Treaty of Paris in 1898, an "unincorporated territory of the United States." 48 U.S.C. § 1421a.

Against this colonial backdrop, the Navy constructed and operated the Ordot Dump for the disposal of municipal and military waste sometime in the 1940s. Even after relinquishing sovereignty over the island, however, the Navy continued to take advantage of the dump. Throughout the Korean and Vietnam Wars, the Navy used the Ordot Dump for the disposal of munitions and chemicals, allegedly including Dichlorodiphenyltrichloroethane—DDT—and Agent Orange, Am. Compl. ¶ 11. It was "the only sited and operational dump

on Guam" until the 1970s, and the only public landfill on the island until its closure in 2011. *Id.* And as the Navy continued to use the Ordot Dump, it continued growing; "[w]hat was once a valley," the District Court of Guam explained, "is now at least a 280-foot mountain of trash." *United States v. Guam,* No.02-00022, slip op. at 1 (D. Guam Jan. 24, 2008).

Despite its extensive use, the Ordot Dump lacked basic environmental safeguards. "[U]nlined on its bottom and uncapped at its top," the landfill absorbed rain and surface water, which percolated through the landfill and mixed with contaminants. Am. Compl. ¶ 12. These contaminants released into the nearby Lonfit River, which flows into the Pago River, and ultimately into the Pacific Ocean at Pago Bay. *Id.*

The Ordot Dump has long attracted the attention of the United States as regulator. EPA added the Ordot Dump to its National Priorities List in 1983, and, in 1988, issued a Record of Decision designating the Navy as a potentially responsible party for the site. *Id.* ¶ 13. But having relinquished sovereignty over the island, the Navy no longer owned and operated the Ordot Dump—Guam did. And, beginning in 1986, EPA repeatedly ordered Guam to devise plans for containing and disposing of waste at the landfill.

Unsatisfied with Guam's remediation attempts, EPA sued Guam in 2002 under the Clean Water Act, 33 U.S.C. §§ 1251 et seq., asserting that Guam violated that act by "discharging pollutants . . . into waters of the United States without obtaining a permit." Complaint for Injunctive Relief, *United States v. Guam,* No. 02-00022, at ¶ 26 (D. Guam) (CWA Compl.), Joint Appendix (J.A.) 86. As EPA explained in its complaint, the Clean Water Act defines "waters of the United States" as "including the territorial seas," *id.* at ¶ 14, J.A. 85 (quoting 33 U.S.C. § 1362(7), and it alleged that Guam "has routinely

discharged untreated leachate from the Ordot [Dump] into the Lonfit River and two of its tributaries," *id.* at ¶ 21, J.A. 85. EPA sought an injunction ordering Guam to comply with the Clean Water Act, by, among other things, "submit[ting] plans and a compliance schedule for a cover system for the Ordot Landfill" and "complet[ing] construction of the cover system to eliminate discharges of untreated leachate." *Id*. ¶ 29, J.A. 86.

Rather than litigate these claims, Guam and EPA entered into a consent decree in 2004, which the District Court of Guam approved. *See* Consent Decree, *United States v. Guam,* No. 02-00022 (D. Guam) (Consent Decree), J.A. 90. That Decree required Guam, among other things, to pay a civil penalty, close the Ordot Dump, and design and install a "dump cover system." *Id.* at 5–12, J.A. 94–101. The Decree expressly states that it "shall apply and be binding upon the Government of Guam . . . and on the United States on behalf of U.S. EPA," and was "based on the pleadings, before taking testimony or adjudicating any issue of fact or law, and without any finding or admission of liability against or by the Government of Guam," *id*. at 3, J.A. 92. Although cleanup continues, Guam officially closed the Ordot Dump in 2011 pursuant to the Decree.

Guam initiated this action against the United States in 2017, arguing that the Navy was responsible for the Ordot Dump's contamination and seeking to recoup its landfill-closure and remediation costs. Alleging that the costs of the Ordot Dump's required remediation would "exceed approximately $160,000,000," Am. Compl. ¶ 15, Guam brought two causes of action relevant here: a CERCLA section 107(a) claim seeking "removal and remediation costs" related to the landfill, *id*. ¶ 25, and, "[i]n the alternative," a section 113(f) contribution action, *id.* ¶ 31.

The United States moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Guam could not avail itself of CERCLA section 107(a) because section 113(f)(3)(B) is "the exclusive CERCLA remedy for the costs a liable party is compelled to incur pursuant to a judicially-approved settlement with the United States." Mot. to Dismiss 18. Pointing to the 2004 Consent Decree, the United States argued that Guam had resolved its liability for a response action, and so had to proceed under section 113 rather than 107. And, because CERCLA section 113 "imposes a three-year statute of limitations on contribution claims" that runs from a consent decree's entry, the United States argued that Guam was time-barred from pursuing that claim. *Id.* at 17, J.A. 61.

The district court, accepting the premise that "Guam is permitted to proceed against the United States for full cost recovery under section 107(a) only if Guam's right to contribution under section 113(f)(3)(B) has not been triggered," explained that "the key question[] that the pending motion to dismiss presents is whether the 2004 Consent Decree 'resolve[d] [Guam's] liability' for the response action or response costs that Guam undertook with respect to the Ordot Landfill and also qualifies as a 'settlement' within the meaning of" CERCLA's contribution provision. *Guam v. United States*, 341 F. Supp. 3d 74, 84 (D.D.C. 2018) (quoting CERCLA § 113(f)(3)(B)) (alterations in original). In a thorough opinion, the district court explained that "whether or not an agreement for the removal or remediation of hazardous waste 'resolves' liability for section 113(f)(3)(B) purposes turns on the terms of the agreement," and concluded that "the 2004 Consent Decree did not resolve Guam's liability for the Ordot Landfill cleanup." *Id.* Because the Decree failed to meet the "statutorily prescribed conditions for bringing a contribution claim under section 113(f)(3)(B)," the court ruled that Guam could

maintain its section 107(a) claim against the United States and denied the United States' motion to dismiss. *Id.*

The United States sought interlocutory appeal of the district court's order pursuant to 28 U.S.C. § 1292(b). The district court, noting that "the courts of appeals diverge . . . with respect to how one best interprets agreement language" of the kind presented here, concluded that "there is substantial ground for difference of opinion regarding at least one controlling issue of law . . . , and that allowing the United States to appeal . . . could materially advance this litigation," and certified the interlocutory appeal of the order. *Guam v. United States*, No. 1:17-CV-2487, 2019 WL 1003606, at *1 (D.D.C. Feb. 28, 2019) (internal quotation marks omitted). We granted the request for interlocutory review. "We review *de novo* the District Court's legal conclusions denying a motion to dismiss." *Liff v. Office of Inspector General for U.S. Department of Labor*, 881 F.3d 912, 918 (D.C. Cir. 2018).

## III.

The first question we must decide, as it underlies this dispute, is whether CERCLA sections 107 and 113 are mutually exclusive. That is, if a party incurs costs pursuant to a settlement and therefore has a cause of action under section 113, is it precluded from seeking cost-recovery under section 107?

While the differences between CERCLA sections 107 and 113 seem clear in theory, the supposedly sharp distinction between cost-recovery and contribution does not always play out in practice. Although the two actions are separate, some situations ostensibly fall under both CERCLA provisions. As the Supreme Court explained in *United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007), "a PRP may sustain

expenses pursuant to a consent decree" that involve cleanup costs. *Id*. at 139 n.6. "In such a case, the PRP does not incur costs voluntarily," as one would while undertaking a cleanup, "but [also] does not reimburse the costs of another party," as one would in a traditional contribution action. *Id.* Having settled with the Government, the PRP is authorized to pursue a section 113(f)(3)(B) contribution action, but because it has incurred cleanup costs, the recoupment of those funds would arguably also fall within section 107. In other words, given that "neither remedy swallows the other," *id.*, both cost-recovery and contribution actions appear available.

In *Atlantic Research*, the Supreme Court "d[id] not decide whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both." *Id.* To date, neither have we. But "every federal court of appeals to have considered the question since *Atlantic Research* . . . has said that a party who *may* bring a contribution action for certain expenses *must* use the contribution action, even if a cost recovery action would otherwise be available." *Whittaker Corp. v. United States*, 825 F.3d 1002, 1007 (9th Cir. 2016); *see id.* at 1007 n.5 (collecting cases).

Today we join our sister circuits. The entire purpose of section 113(f)(3)(B) is to "permit[] private parties to seek contribution after they have settled their liability with the Government." *Atlantic Research Corp*., 551 U.S. at 132 n.1. Allowing a PRP that has settled with the government to instead seek recoupment through a section 107 cost-recovery claim would render section 113(f)(3)(B) superfluous; if a PRP could choose whether to sue under section 107 or section 113, "a rational PRP would prefer to file an action under § 107(a)[] in every case." *Hobart Corp. v. Waste Management of Ohio, Inc*., 758 F.3d 757, 767 (6th Cir. 2014). Like any statute, CERCLA must be "read as a whole," *King v. St. Vincent's Hospital*, 502

U.S. 215, 221 (1991), and we decline to interpret section 113(f)(3)(B) as providing superfluous relief to a party that has settled with the United States or a State.

Having concluded that section 113(f)(3)(B) and section 107 are mutually exclusive, we must address one more threshold issue. Section 113(f)(3)(B) reads: "A person who has resolved its liability to the United States . . . for some or all of a response action or for some or all of the costs of such action in a[] . . . judicially approved settlement may seek contribution from *any person who is not party to a settlement* referred to in paragraph (2)." CERCLA § 113(f)(3)(B) (emphasis added). Paragraph (2), in turn, provides that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." *Id.* § 113(f)(2). Here, we face an unusual situation: the United States, through the Navy, is a potentially responsible party, but the United States, through EPA, is also the regulator that has brought the enforcement action. At first blush, the "not party to a settlement" language would seem to preclude a contribution suit by Guam against the United States regardless of whether the settlement otherwise triggers section 113(f)(3)(B); after all, the United States is a "party to a settlement" with Guam.

CERCLA "is not a model of legislative draftsmanship," *Exxon Corp. v. Hunt*, 475 U.S. 355, 363 (1986), and, read literally, section 113(f)(3)(B)'s "not party to *a* settlement" language could create non-sensical results. For example, imagine hypothetical Company X settles with EPA for the costs of response actions for a contaminated site in California in 1990. By virtue of becoming "party to *a* settlement," Company X would gain immunity from *any* future section 113(f)(3)(B) action, even if that action were to arise decades

later for an entirely unrelated site in Massachusetts. The very first time an agency of the United States settled with a potentially responsible party at *any* site, moreover, that agency would become wholly immune to section 113(f)(3)(B) claims at *every* site where it may be a responsible party. "A fair reading of legislation demands a fair understanding of the legislative plan," *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015), and given that section 113 clearly seeks to incentivize private parties to settle with the United States, we decline to read the "not party to a settlement" language as forever foreclosing contribution actions against *any* party that has ever settled *any* qualifying claim.

The United States offers two alternative interpretations. First, it argues that reading sections 113(f)(2) and 113(f)(3)(B) together demonstrates that the phrase "any person who is not party to a settlement referred to in paragraph (2)" simply means any person not insulated from such a contribution claim by a section 113(f)(2) settlement. Appellant's Suppl. Br. 7. Alternatively, it argues that, even if the phrase means that a contribution action could not be brought against any party to any settlement whatsoever, it does not matter here because the Consent Decree was a settlement between Guam and the EPA and Guam's contribution action is against the Navy—a different federal agency. *Id.* at 7-9. Because we agree with the first alternative, we need not address the second.

Congress enacted Section 113(f) to bring PRPs "to the bargaining table at an early date." *Asarco LLC v. Atl. Richfield Co.*, 866 F.3d 1108, 1117 (9th Cir. 2017) (quoting *Whittaker Corp.*, 825 F.3d at 1013 (Owens, J., concurring)). Section 113(f) accomplishes this goal by providing two benefits to such PRPs: a "defensive benefit" to PRPs who decide to resolve their liability by entering a settlement with the United States or with a State and are thereby protected against contribution

actions brought by other PRPs regarding matters included in the settlement, *see* CERCLA § 113(f)(2); and an "offensive benefit" to those same PRPs who, again, in exchange for resolving their liability, can pursue other PRPs for contribution, *see id.* § 113(f)(3)(B).

Reading these two sections *in pari materia*, we interpret the phrase "any person who is not party to a settlement referred to in paragraph (2)" in section 113(f)(3)(B) to mean that one benefit does not cancel out the other. *See Motion Picture Association of America, Inc. v. F.C.C.*, 309 F.3d 796, 801 (D.C. Cir. 2002) ("Statutory provisions *in pari materia* normally are construed together to discern their meaning."). Section 113(f)(3)(B) provides that a person who has resolved its liability with the United States or a State can pursue a contribution action against any person but it notes that the right to seek contribution does not erase the protection provided under section 113(f)(2). For example, if Company A resolves its liability for a response action with the United States, it is protected under section 113(f)(2) from future contribution actions related to its settlement with the United States. The fact that Company B subsequently also resolves its liability to the United States in a related action—and can thereby initiate a contribution action against "any person" under section 113(f)(3)(B)—cannot mean that Company A's protection under section 113(f)(2) is forfeited, leaving it vulnerable to a contribution suit by Company B. This is what the phrase "any person who is not party to a settlement referred to in paragraph (2)" clarifies. Another way to view the two provisions working in tandem is to think of the above hypothetical in reverse. As the Third Circuit has explained, "[i]t appears that the statute allows the government to immunize a late settlor from an early settlor's contribution suit by settling with the government." *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1186 (3d Cir. 1994); *see also* J. Whitney Pesnell, *The Contribution Bar*

*in CERCLA Settlements and Its Effect on the Liability of Nonsettlors*, 58 La. L. Rev. 167, 231 (1997) ("[Section 113(f)(2)] provides, in no uncertain terms, that parties who have resolved their liability to the government in a judicially approved settlement, such as the parties to the second settlement, shall not be liable for claims for contribution regarding matters addressed in the settlement.").

This interpretation is supported by the fact that Congress chose to reference "paragraph (2)" within section 113(f)(3)(B). "[W]e are obliged to give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). In section 113(f)(3)(B), Congress did not state "any person who is not party to a settlement" alone; instead, it specifically stated "any person who is not a party to a settlement *referred to in paragraph (2)*." CERCLA § 113(f)(3)(B) (emphasis added). A settlement included in "paragraph (2)" means a settlement entered into by a person to resolve its liability to the United States or a State in order to secure protection from a contribution action. Therefore, giving effect to section 113(f)(3)(B)'s express reference to section 113(f)(2) and reading that section in harmony with section 113(f)(3)(B), we think it quite clear that section 113(f)(3)(B) allows a person to seek contribution from any person other than those persons protected by their own settlement under section 113(f)(2). Put differently, a person may not use section 113(f)(3)(B) to seek contribution against a person who has resolved its liability through a settlement agreement under section 113(f)(2) to the extent the contribution action involves matters addressed in that settlement.

Here, the "any person who is not a party" language in section 113(f)(3)(B) does nothing to prohibit Guam's contribution action. Guam is not attempting to pursue a contribution action against a PRP that has already resolved its

liability to the United States or a State and is thus protected by section 113(f)(2). The key inquiry, then, is this: did the 2004 Consent Decree "resolve [Guam's] liability" for a response action within the meaning of section 113(f)(3)(b), thus triggering Guam's right to seek contribution and precluding it from seeking cost-recovery under section 107? It is to that question we now turn.

**A.**

In order to trigger CERCLA section 113(f)(3)(B), a party must have "resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in a[] . . . judicially approved settlement." CERCLA § 113(f)(3)(B). Guam contends that the 2004 Consent Decree cannot qualify as a settlement under CERCLA because it settled an action brought by EPA under the Clean Water Act, not CERCLA. In Guam's view, the Consent Decree "requires reference to CERCLA to trigger a Section 113(f)(3)(B) claim." Appellee's Br. 26 n.11.

"Whether a non-[CERCLA] settlement agreement may give rise to a contribution action has split the circuits," three to one. *Asarco*, 866 F.3d at 1119. As the Ninth Circuit recently explained, both it and the Third Circuit have concluded that "Congress did not intend to limit § 113(f)(3)(B) to response actions and costs incurred under CERCLA settlements," and that "a non-[CERCLA] settlement agreement may form the necessary predicate for a § 113(f)(3)(B) contribution action." *Id.* at 1120–21; *see also Trinity Industries, Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 136 (3d Cir. 2013) (same). The Seventh Circuit has recently concluded the same. *See Refined Metals Corp. v. NL Industries Inc.*, 937 F.3d 928, 932 (7th Cir. 2019) ("[Section] 113(f)(3)(B) . . . does not limit covered settlements to those that specifically mention

CERCLA."). The Second Circuit has gone the other way, holding that section 113(f)(3)(B) creates a "contribution right only when liability for CERCLA claims . . . is resolved." *Consolidated Edison Co. of New York, Inc. v. UGI Utilities, Inc.*, 423 F.3d 90, 95 (2d Cir. 2005). More recently, however, the Second Circuit cast doubt on that holding, noting that EPA "understandably takes issue" with that case and that "there is a great deal of force to [its] argument." *Niagara Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112, 126 n.15 (2d Cir. 2010).

We agree with the Third, Seventh, and Ninth Circuits that section 113(f)(3)(B) does not require a CERCLA-specific settlement. As the Seventh and Ninth have pointed out, another provision of section 113—paragraph (f)(1)—expressly requires that a party first be sued under CERCLA section 106 or 107 before pursuing contribution. *See* CERCLA § 113(f)(1) ("Any person may seek contribution from any other person who is liable or potentially liable under section [1]07(a) of this title, *during or following any civil action under section [1]06 of this title or under section [1]07(a) of this title*.") (emphasis added). But section 113(f)(3)(B) contains no such CERCLA-specific language, and "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion," *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal citation, alterations and quotation marks omitted). We therefore conclude that a settlement agreement can trigger section 113(f)(3)(B) even if it never mentions CERCLA.

**B.**

But that conclusion gets us only so far. The fact that a non-CERCLA settlement *can* trigger section 113(f)(3)(B) tells us

little about whether the 2004 Consent Decree, in fact, "resolve[d] [Guam's] liability" for some or all of the response action or response costs that Guam undertook with respect to the Ordot Dump. "Whether or not liability is resolved through a settlement" is unanswerable by a "universal rule;" it instead requires examination of "the terms of the settlement on a case-by-case basis." *Bernstein v. Bankert*, 733 F.3d 190, 213 (7th Cir. 2013). Because "a consent decree . . . is essentially a contract," a court's "construction of a consent decree is essentially a matter of contract law," *Segar v. Mukasey*, 508 F.3d 16, 21 (D.C. Cir. 2007) (internal quotation marks omitted), and where, as here, that consent decree binds the United States, that contract is "governed exclusively by federal law," *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988).

We begin with CERCLA's text. The phrase "resolved its liability" is nowhere defined in the statute, meaning our interpretation of these words should start "with their ordinary meaning." *BP American Production Co. v. Burton*, 549 U.S. 84, 91 (2006). The word "resolve" usually means "to deal with successfully," "reach a firm decision about," or "work out the resolution" of something. *Resolve*, *Merriam-Webster's Collegiate Dictionary* 997 (10th ed. 1997). Our sister circuits have likewise concluded that in the context of section 113(f)(3)(B), "resolved" means "decided, determined, or settled—finished, with no need to revisit," *Bernstein*, 733 F.3d at 211, that is, a "firm decision" that is no longer "susceptible to further dispute or negotiation," *Asarco*, 866 F.3d at 1122 (internal quotation marks omitted). The word "[l]iability," in turn, means an "obligat[ion] according to law or equity." *Liability*, *Merriam-Webster's Collegiate Dictionary* 670 (10th ed. 1997); *see also Liability*, Black's Law Dictionary (11th ed. 2019) ("the quality, state, or condition of being legally obligated or accountable; legal responsibility to another or to

society, enforceable by civil remedy or criminal punishment."); *Asarco*, 866 F.3d at 1124 ("a settlement agreement must determine a PRP's compliance *obligations*") (emphasis added). Taking the phrase "resolved its liability" as a whole, we think it clear that "a PRP's liability must be decided, determined, or settled, at least in part, by way of agreement with the EPA." *Bernstein*, 733 F.3d at 212 (emphasis in original removed).

So far, so good—but liability for what? Recall that section 113(f)(3)(B) kicks in where a party has resolved its liability for "some or all of a *response action*" or for some or all "of the costs of such action." CERCLA § 113(f)(3)(B) (emphasis added). As Guam readily admits, "'[r]esponse' is a term of art in CERCLA," Appellee's Br. 9, and it entails a wide range of actions. Specifically, "response" is defined as any "removal . . . and remedial action; [and] all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." CERCLA § 101(25). "Removal," in turn, is defined as "the cleanup or removal of released hazardous substances from the environment," "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances," "the disposal of removed material," or "other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment." *Id.* § 101(23). And "remedy" or "remedial action" means "actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment," or actions "to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." *Id.* § 101(24). And there is more: remedial action includes "storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of

released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations," as well as the "repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment." *Id.* Section 113(f)(3)(B) comes into play, therefore, when a party has resolved its liability for "some or all" of any of the above actions.

By its plain terms, the 2004 Consent Decree "resolve[d]" Guam's liability for "some . . . of a response action." The Consent Decree provides that it "shall be in full settlement and satisfaction of the civil judicial claims of the United States against the Government of Guam as alleged in the Complaint filed in this action." Consent Decree ¶ 45, J.A. 112. EPA's Complaint, in turn, sought an injunction requiring Guam to comply with the Clean Water Act, by, among other things, "submit[ting] plans and a compliance schedule for a cover system for the Ordot Landfill" and for "complet[ing] construction of the cover system to eliminate discharges of untreated leachate." CWA Complaint ¶ 29, J.A. 86. The Consent Decree further obligates Guam to design and install a "dump cover system." Consent Decree ¶ 8, J.A. 94. Construction and installation of a cover falls squarely within the definition of a "remedial action," which includes the "confinement" of substances and the "repair or replacement of leaking containers." CERCLA § 101(24). EPA's Clean Water Act lawsuit, in other words, sought injunctive relief for Guam to take action that qualified as a "response action," and the 2004 Consent Decree released Guam from legal exposure for that claim in exchange for Guam's commitment to perform work that qualified as a "response action."

That "construction of the cover system to eliminate discharges of untreated leachate" "resolv[ed] [Guam's] liability . . . for some or all of a response action" within the meaning of CERCLA section 113(f)(3)(B), triggering that section and precluding Guam from seeking cost-recovery under section 107.

## C.

Despite the clarity of the Consent Decree, Guam insists that, for several reasons, the Decree did not "resolve" Guam's liability to the United States. We are unpersuaded.

Guam first argues that because "the US broadly and unconditionally reserved all of its rights, including its rights to pursue CERCLA claims," the Consent Decree is "replete with ongoing legal exposure for Guam" and therefore "did not resolve liability with the requisite finality to trigger a Section 113(f)(3)(B) contribution claim." Appellee's Br. 25; 28–29. True, the Consent Decree provides that "[n]othing . . . shall limit the ability of the United States to enforce any and all provisions of applicable federal laws and regulations." Consent Decree ¶ 46, J.A. 112. But that provision applies only to "violations *unrelated to the claims in the Complaint*." *Id.* (emphasis added). This reservation of rights tells us nothing about what the complaint and the consent decree do or do not resolve under CERCLA. Section 113(f)(3)(B) is clear, moreover, that it requires merely the resolution of liability for "some" of a response action. In order to trigger section 113(f)(3)(B), a decree need not decisively determine every action that a party may one day be required to perform at the relevant site. What matters is whether what it *does* require qualifies as "some" of a "response action." And as explained above, *supra* at 16–20, Guam's construction obligations for the Ordot Dump—agreed to under the threat of injunctive relief—

qualified as "some of" a "response action" under CERCLA. The consent decree's reservation of rights for unrelated claims does nothing to alter that analysis.

Guam next contends that the Consent Decree cannot have triggered section 113(f)(3)(B) because "it only releases Guam from . . . liability upon full implementation of the settlement's requirements, and performance is ongoing." Appellee's Br. 19. Such a reading, however, would nullify section 113(f)(3)(B) in a host of cases. According to section 113's statute of limitations, a party must bring a contribution action "no more than 3 years after . . . *entry of a judicially approved settlement*." CERCLA § 113(g)(3)(B) (emphasis added). The clock starts to run, in other words, on entry of the settlement, not when liability is "resolved." But under Guam's theory, liability may not be "resolved" for quite some time. For example, the Decree requires Guam to perform within "44 months"—nearly four years. Consent Decree ¶ 9, J.A. 100. Guam's view—that liability is not "resolved" until that performance is complete— would produce an absurd result: Guam's cause of action under section 113 would not accrue until *after* the statute of limitations runs. *See Asarco*, 866 F.3d at 1124 n.8 (rejecting such a reading of CERCLA). And Guam would hardly be alone. A different CERCLA provision, section 122, provides that "[a] covenant not to sue concerning future liability to the United States shall not take effect until the President certifies that remedial action has been completed." CERCLA § 122(f)(3). If parties "resolve" their liability only following full performance and Presidential certification, most PRPs would find themselves barred by the statute of limitations by the time they gained the ability to sue under section 113(f)(3)(B). Congress could not have intended such a result.

Next, Guam directs us to the Consent Decree's disclaimer of liability, which provides that the parties' agreement is

"based on the pleadings, before taking testimony or adjudicating any issue of fact or law, and without any finding or admission of liability against or by the Government of Guam." Consent Decree 3, J.A. 92. Pointing to what it calls this "clear and unambiguous" language, Guam urges us to take the disclaimer at its word. Appellee's Br. 16–17. To be sure, a disclaimer of liability may weigh against the conclusion that the parties intended to resolve liability within the meaning of section 113(f)(3)(B). *See, e.g.*, *Florida Power Corp. v. FirstEnergy Corp.*, 810 F.3d 996, 1002 (6th Cir. 2015) (finding that consent decree did not resolve the plaintiff's liability, in part because "the plaintiff had not conceded the question of its liability"). As other circuits faced with similar language have observed, however, "parties often expressly refuse to concede liability under a settlement agreement, even while assuming obligations consistent with a finding of liability." *Asarco*, 866 F.3d at 1123. Accordingly, "the mere fact that [a party] refused to admit liability is not enough to exempt [a consent] [d]ecree from the reach of section 113(f)(3)(B)." *Refined Metals Corp.*, 937 F.3d at 931. Here, the disclaimer of liability, standing alone, cannot overcome the Consent Decree's substantive provisions. And because we have concluded that those substantive terms do, in fact, "resolve" Guam's "liability" to the United States "for some . . . of a response action," *supra* at 16–20, the Consent Decree triggers section 113(f)(3)(B) despite the disclaimer.

Guam nonetheless asserts that the consent decree falls outside CERCLA's provisions because the statute covers "[c]ontamination involving 'hazardous substances'" and the Clean Water Act violations alleged in EPA's Complaint concerned "non-CERCLA pollutant discharges only." Appellee's Br. 42. But the Complaint demanded that Guam "complete construction of [a] cover system to eliminate discharges of untreated leachate," CWA Compl. ¶ 29, and

CERCLA expressly identifies the "collection of leachate and runoff" as a "remedial action," CERCLA § 101(24).

And finally, Guam argues that denying it the right to seek recovery under section 107 presents constitutional concerns. "[A]s to non-settling PRPs," Guam insists, "the right to contribution is a property interest, which cannot be extinguished without due process of law." Appellee's Br. 49 (internal quotations omitted). Because a qualifying section 113(f)(3)(B) settlement insulates *Guam* from further contribution suits, Guam argues that other PRPs lack notice, and "[a]llowing the [Clean Water Act] and [Consent Decree] at issue here to trigger contribution rights equates to silently extinguishing the property interest of anyone who might have a potential claim against a settling party without due process of law." *Id.* Although it is far from clear whether Guam could assert this claim on behalf of absent third parties, because Guam failed to raise it in the district court, "it is forfeited." *Keepseagle v. Vilsack*, 815 F.3d 28, 36 (D.C. Cir. 2016). And as to Guam's own rights, Guam lost the ability to bring a contribution claim not because it was deprived of due process, but because the statute of limitations ran.

## IV.

From Guam's perspective, the result we reach today is harsh. "[A]ccept[ing] as true," as we must at this stage, "all material allegations of the complaint," *Barker v. Conroy*, 921 F.3d 1118, 1121 (D.C. Cir. 2019) (internal quotations omitted), the United States deposited dangerous munitions and chemicals at the Ordot Dump for decades and left Guam to foot the bill. The practical effect of our decision is that Guam cannot now seek recoupment from the United States for that contamination because its cause of action for contribution expired in 2007. Unfortunately for Guam, however, "where a

statute is clear, the courts are not at liberty to construe the statute other than according to its terms, or to depart from its clear requirements." *Hirshfeld v. District of Columbia*, 254 F.2d 774, 775 (D.C. Cir. 1958) (internal citations omitted). And while offering little consolation to Guam, EPA has reduced the likelihood that these circumstances will reoccur by since revising its model settlement language to include an express statement that the parties "agree that this Settlement Agreement constitutes an administrative settlement for purposes of Section 113(f)(3)(B) of CERCLA." *Florida Power Corp.*, 810 F.3d at 1009.

For the foregoing reasons, we reverse the district court's denial of the United States' motion to dismiss and remand with instructions to dismiss the complaint.

*So ordered.*