# United States Court of Appeals for the Federal Circuit

---

**TIMOTHY LABATTE,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2017-2396

---

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00798-BAF, Senior Judge Bohdan A. Futey.

---

Decided: August 16, 2018

---

ERICK G. KAARDAL, Mohrman, Kaardal & Erickson, P.A., Minneapolis, MN, argued for plaintiff-appellant.

MATTHEW PAUL ROCHE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by CHAD A. READLER, ROBERT E. KIRSCHMAN, JR., MARTIN F. HOCKEY, JR.

---

Before PROST, *Chief Judge,* DYK and TARANTO, *Circuit Judges.*

DYK, *Circuit Judge*.

Timothy LaBatte appeals from a judgment of the Court of Federal Claims ("Claims Court"), dismissing his complaint for breach of contract for lack of subject-matter jurisdiction. *LaBatte v. United States*, No. 16-798C, slip op. at 15 (Fed. Cl. July 28, 2017). Because the court erred in concluding that it lacked jurisdiction, we reverse and remand.

BACKGROUND

When assessing a motion to dismiss for lack of subject-matter jurisdiction, we "accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff," in this case, Mr. LaBatte. *See Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). Mr. LaBatte's complaint alleges the following.

In 1999, a group of Native American farmers filed a lawsuit against the Secretary of Agriculture, alleging that the United States Department of Agriculture ("USDA") had discriminated against them in the administration of farm loan and other benefit programs, thereby violating the Equal Credit Opportunity Act, 15 U.S.C. § 1691. The district court certified a class, which included Mr. LaBatte, a farmer and member of the Sisseton Wahpeton Tribe of South Dakota. *See Keepseagle v. Veneman*, No. 99-3119, 2001 WL 34676944, at *15 (D.D.C. Dec. 12, 2001). Ultimately, the government reached a class-wide settlement, known as the Keepseagle Settlement Agreement (the "Agreement"). According to the Agreement, the United States would provide a compensation fund totaling $680 million.

The Agreement established a two track process, "A" or "B," for processing claims. Track A was limited to claimants seeking a standard set of payments of $50,000 and other limited relief. The Track A process used documen-

tary evidence and was conducted with a paper only record. Claimants had to demonstrate by substantial evidence that they "applied, or attempted to apply, for a specific farm [loan] at a USDA office" and that the loan was "denied, provided late, approved for a lesser amount than requested, encumbered by a restrictive condition(s), or USDA failed to provide an appropriate loan service(s)." J.A. 114–15. Track A did not require proof of discrimination.

Under Track B, a claimant could seek damages up to $250,000. As with Track A, the determination was made on a paper record and required allegations that the claimant had applied for USDA loans and that the government failed to properly process them. However, unlike Track A, the claimant had to establish by a preponderance of the evidence that the "treatment of the Claimant's loan or loan servicing application(s) by USDA was less favorable than that accorded a specifically identified, similarly situated white farmer(s)." J.A. 117. Track B provided that the "identity of a similar situated white farmer" could be established "by a credible sworn statement based on personal knowledge by an individual who is not a member of the Claimant's family." J.A. 118. A neutral arbiter (the "Neutral") was tasked with reviewing the record without a hearing. The Agreement made clear that there was no appeal once the Neutral made his decision, as "Claim Determinations, and any other determinations made under this Non-Judicial Claims Process are final and are not reviewable by the Claims Administrator, the Track A Neutral, the Track B Neutral, the District Court, or any other party or body, judicial or otherwise." J.A. 111. Under the terms of the Agreement, "the United States [would] have no role in the Non-Judicial Claims Process." *Id.*

Mr. LaBatte filed his claim under the Track B process, seeking $202,700.52 in damages. It appears to be undisputed that Mr. LaBatte satisfies the relevant crite-

ria for membership in the class.[1]  Mr. LaBatte identified two non-family persons who had personal knowledge of the USDA's treatment of similarly situated white farmers.   Mr. LaBatte's witnesses were Russell Hawkins ("Hawkins") and Tim Lake ("Lake").

Hawkins and Lake belonged to the same tribe as Mr. LaBatte—the Sisseton Wahpeton Sioux Tribe of South Dakota.  At the time of the USDA's alleged wrongdoing, Hawkins was Mr. LaBatte's Tribal Chairman.  When Mr. LaBatte prepared to submit a claim under the Settlement Agreement's Track B process, both Hawkins and Lake worked for the Bureau of Indian Affairs ("BIA"), a government agency within the Department of the Interior.

Both men agreed to provide Mr. LaBatte with a sworn declaration, detailing the USDA's discriminatory acts to meet the criteria of the Agreement.  Based on conversations with Lake and Hawkins, Mr. LaBatte's attorney prepared preliminary declarations from Lake and Hawkins, intending to revise the drafts after further conversa-

---

[1]    Those criteria were:
   a. Must be a Native American as defined in the Agreement under Section II.BB.
   b. Must have farmed, ranched, or attempted to farm or ranch between January 1, 1981 and November 24, 1999.
   c. Must have applied to USDA in that time period for participation in a farm program.
   d. A class member must have filed a discrimination complaint with USDA either individually or through a representative.
*LaBatte*, slip op. at 2.

tions with, and review by, those witnesses. Hawkins, in his draft declaration, stated that

> Tim LaBatte asked Mr. Charles Twitero, the FmHa County Director about applying for a $330,000 full Land Buying, Livestock Purchase and Operating Expense Loan. I know Tim LaBatte filled out an application. After returning to Mr. Twitero's office several times to discuss the loan proposal, Mr. Twitero stated that he simply could not help Tim LaBatte. . . . Mr. Twitero, as a federal agent, was too busy with other loans to non-Indians to service loans to Indian farmers. He gave no loans to Indian farmers while giving loans to non-Indian farmers. This was federal loan discrimination.

J.A. 155. He also stated that he knew that "[n]on-Indian farmers in the area were receiving loans in the amounts Mr. LaBatte and other Indian farmers were requesting" and provided the names of seven such non-Indian loan recipients. J.A. 156. Lake's draft declaration had similar information. Lake pointed out that "Indian farmers like Tim LaBatte received zero or nominal loans compared to what the non-Indian farmers received. This was federal loan discrimination against Tim LaBatte and others." J.A. 152. As required, Mr. LaBatte and his attorney prepared to present the declarations from Lake and Hawkins to the Track B Neutral.

After the initial declarations were prepared, but before Mr. LaBatte could finalize and revise the documents and obtain signatures, the United States directed Hawkins and Lake not to sign the declarations or to assist in revising the declarations. Hawkins and Lake were "directed or instructed by federal governmental officials *not to sign* declarations of facts that supported LaBatte's claim," J.A. 64, and were instructed not to provide any additional information to Mr. LaBatte, preventing Mr.

LaBatte from revising or elaborating on the information in the declaration. Mr. LaBatte alleges that "[b]oth witnesses, former Tribal Chair Hawkins and Lake had agreed to provide complete testimony and sign declarations on LaBatte's behalf for his Track B process claim," J.A. 74, and that, because of the government's interference, the declarations of Hawkins and Lake were unable to be "review[ed], revis[ed], and ultimately execut[ed] prior to the LaBatte Track B process filing." *Id.* Mr. LaBatte alleges that these actions by the government breached the Agreement.

Because Mr. LaBatte was unable to submit finalized, signed declarations, he instead submitted to the Neutral a declaration from his lawyer that detailed his attempts to obtain the information necessary. The declaration stated that Mr. LaBatte had located two individuals, Hawkins and Lake, who were willing to submit declarations in support of Mr. LaBatte's claim of discrimination, but, because they were BIA employees, "the federal government (the defendant in this case) would not allow them to sign the declarations." SAppx. 7. Mr. LaBatte attached the unsigned initial draft declarations of Hawkins and Lake.

On October 30, 2012, the Track B Neutral issued a final determination denying Mr. LaBatte's claim for having "failed to satisfy the requirement of the Settlement Agreement, through a sworn statement, that named white farmers who are similarly situated to you received USDA loans or loan servicing that was denied to you." J.A. 173.

On July 10, 2013, Mr. LaBatte filed a motion to intervene in the proceedings underlying the Settlement Agreement in the United States District Court for the District of Columbia. Mr. LaBatte asserted, among other things, that government officials had breached the Settlement Agreement and its implied covenant of good faith

and fair dealing, by preventing witnesses from signing declarations and providing information. The court denied Mr. LaBatte's motion to intervene on the ground that it did not possess jurisdiction over his claims. Mr. LaBatte appealed the district court's decision to the District of Columbia, which affirmed, *see Keepseagle v. Vilsack*, 815 F.3d 28, 32 (D.C. Cir. 2016), explaining that the Settlement Agreement's enforcement clause provided the district court with jurisdiction only to enforce the distribution of the funds.

On July 5, 2016, Mr. LaBatte filed a complaint in the Claims Court. Mr. LaBatte alleged that the government "breached the Settlement Agreement and breached the government's duty of good faith and fair dealing resulting in the loss of monetary damages," J.A. 25, by ordering Messrs. Hawkins and Lake not to sign and to refrain "from testifying and providing evidence on behalf of LaBatte's claim." J.A. 73. As damages, Mr. LaBatte sought an award of his full Track B claim amount of $202,700.52. The government moved to dismiss Mr. LaBatte's complaint for lack of subject-matter jurisdiction and for failure to state a claim.

The Claims Court granted the government's motion and dismissed the complaint for lack of jurisdiction. Although the court recognized that it had jurisdiction over breach of settlement claims, the court concluded that it lacked jurisdiction over Mr. LaBatte's case. The court decided that Mr. LaBatte had, in the Track B process of the Settlement Agreement, waived his right to judicial review to challenge the breach of the Agreement by the United States, because the Agreement contained a finality clause. The court held that Mr. LaBatte "'fail[ed] to account for Agreement's strong finality language declaring all claim determinations final and unreviewable.'" *LaBatte*, slip op. at 14–15 (quoting *Keepseagle*, 815 F.3d at 34).

Mr. LaBatte appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). We review decisions of the Court of Federal Claims de novo with respect to questions of law, including a dismissal for lack of subject-matter jurisdiction. *Banks v. United States*, 741 F.3d 1268, 1275 (Fed. Cir. 2014).

DISCUSSION

I

The Claims Court erred in holding that the Agreement barred Mr. LaBatte's suit for breach of that agreement. The Claims Court relied on language in the Agreement that stated that "[t]he Claim Determinations, and any other determinations made under this Non-Judicial Claims Process are final and are not reviewable by the Claims Administrator, the Track A Neutral, the Track B Neutral, the District Court, or any other party or body, judicial or otherwise." J.A. 111. The court concluded that, by entering into the Agreement, "Mr. LaBatte had contracted out his right to a judicial review." *LaBatte*, slip op. at 12.

However, the Agreement does not on its face bar claims for breach of the Agreement, and Mr. LaBatte is not requesting judicial review of the Track B Neutral's determination. Mr. LaBatte is simply alleging that the government's interference with the witnesses constituted a breach of the Agreement. For instance, Mr. LaBatte alleges that

> During the claims process, government officials—who never denied their acts—deliberately prevented witnesses from testifying who could provide evidence of the USDA's discrimination against LaBatte. Under the terms of the Settlement Agreement, the witnesses were *required* for the claims process. The government's deliberate acts to prevent the testimony effectively destroyed

> evidence. The actions of the government were purposeful and deliberate.

J.A. 85. Mr. LaBatte is clearly alleging a breach of the Agreement.

There is no language in the Agreement that suggests that breach of the Agreement would not give rise to a new cause of action. Indeed, it is well established that a "suit for breach of [a] settlement agreement alleges a new cause of action which could not have been brought in the previous suit." *Catullo v. Metzner*, 834 F.2d 1075, 1078 (1st Cir. 1987). It is also well established that finality provisions in settlements do not bar claims for breach of the settlement. In the similar context where a party to a settlement agreement waives the right to appeal an adverse decision in the underlying litigation, we and other courts have held that the waiver does not apply to claims for breach of the settlement agreement itself. If an agency breaches a settlement agreement, "a waiver of appeal rights will not be enforced." *Link v. Dep't of Treasury*, 51 F.3d 1577, 1581 (Fed. Cir. 1995); *see also Saksenasingh v. Sec'y of Educ.,* 126 F.3d 347, 349–50 (D.C. Cir. 1997).

We see no basis for construing the finality provision in the Agreement to bar suit for breach of the Agreement, and we conclude that the Claims Court erred in determining that the Agreement precluded Mr. LaBatte's suit for breach of contract.

Finally, as to jurisdiction, the government argues that "[t]here is no indication that the Settlement Agreement contemplates a right to money damages in the event of a breach and Mr. LaBatte fails to point to any provision to the contrary." Appellee Br. 23. In *Holmes v. United States,* we held that in "a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary." 657 F.3d 1303, 1314 (Fed. Cir.

2011).  In *Rocky Mountain Helium, LLC v. United States*, we held that when "there is a breach of a government contract, 'as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement.'"  841 F.3d 1320, 1327 (Fed. Cir. 2016) (quoting *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001)).  "Typically, based on that presumption, 'no further inquiry is required' into whether money damages are available."  *Id.* (quoting *Holmes*, 657 F.3d at 1314).  This is true, even when "there [was] no language in the agreements indicating that the parties did not intend for money damages to be available in the event of breach."  *Holmes*, 657 F.3d. at 1316.  In this case, Mr. LaBatte's allegations, and his prayer for monetary relief, are more than sufficient to establish jurisdiction in the Claims Court.

## II

We next address whether the complaint sufficiently alleges a breach.  We conclude that Mr. LaBatte alleges a breach of the Agreement by the government and that dismissal for failure to state a claim is not appropriate.

Mr. LaBatte alleges that "the federal government breached its obligations under the Settlement Agreement and under the covenant of good faith and fair dealing, by directly prohibiting its employees Hawkins and Lake from testifying on LaBatte's behalf."  J.A. 31.  Mr. LaBatte alleges numerous times that "prior to LaBatte submitting his Track B claim application, the government directly interfered with LaBatte's claim process by preventing his former Tribal Chairman Russell Hawkins [and Lake] from testifying and providing evidence on behalf of LaBatte's claim."  J.A. 73.  The government appears not to contest the fact that Hawkins and Lake were given instructions not to sign the declarations or to assist Mr. LaBatte in providing information to revise the declarations.

Mr. LaBatte alleges two theories concerning breach, and we conclude that the allegations in Mr. LaBatte's complaint are more than sufficient to plausibly allege a breach of the Agreement. The Agreement states that the United States "shall have no role in the Non-Judicial Claims Process." J.A. 111. The complaint plausibly alleges that the government's actions breached that provision by interfering with Mr. LaBatte's ability to secure necessary information, since the complaint alleges that Mr. Hawkins and Mr. Lake are the only living witnesses who could have provided the information necessary for a Track B claim. The complaint also sufficiently alleges a breach of the covenant of good faith and fair dealing. The Restatement (Second) of Contracts § 205, Comment d (1981), explains that the duty of good faith and fair dealing prohibits "interference with or failure to cooperate in the other party's performance." This is true, even if "the actor believes his conduct to be justified." *Id.* The covenant "'imposes on a party . . . the duty . . . to do everything that the contract presupposes should be done by a party to accomplish the contract's purpose.'" *Stockton E. Water Dist. v. United States,* 583 F.3d 1344, 1365 (Fed. Cir. 2009) (quoting 30 Richard A. Lord, *Williston on Contracts* § 77.10 (4th ed. 1999)). The covenant prevents parties from "act[ing] so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed. Cir. 2005). If the government prevented Lake and Hawkins from signing, revising, and updating their declarations, the government would breach the covenant of good faith and fair dealing, by interfering with Mr. LaBatte's ability to present his case to the Track B Neutral.

However the government points out that "an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, . . . by conflicting with a contract

provision." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014). The government argues that the Agreement sanctioned its conduct and that "the Government's actions were consistent with the Settlement Agreement's express terms." Appellee Br. 25. Ironically, the government relies on the provision of the Agreement that Mr. LaBatte alleges to have been breached, the provision stating that "the United States shall have no role in the Non-Judicial Claims Process." J.A. 111. The Agreement defines the "United States" as "individually and collectively, the Executive Branch of the United States, its agencies, instrumentalities, agents, officers, and employees." J.A. 101. The government argues that Hawkins and Lake, being government employees, cannot play a role in the process by supplying evidence. Such a prohibition would be unusual, and absent explicit language, this provision cannot be read to prohibit government employees from testifying or giving any information in the claims process in their personal capacities. If the government has the right to prevent employees from testifying, that authority must come from some other source.

Department of Interior regulations dictate that "it is the Department's general policy not to allow its employees to testify." 43 C.F.R. § 2.281(a). However, employees of the government are allowed to testify to information that they did not secure as a result of their government employment. The Department of Interior regulations recognize this and provide that employees may "voluntarily testify, while on their own time or in approved leave status, as private citizens as to facts or events that are not related to the official business of the Department," as long as they make clear "for the record that the testimony represents [their] own views and is not necessarily the official position of the Department." 43 C.F.R. § 2.280(c)(5). Indeed, the regulations state that, the "Department's general policy not to allow its employees to

testify or to produce Department records either upon request or by subpoena" does not apply to "proceedings covered by § 2.80(c)," i.e., testimony given in an employee's personal capacity. *Id.* § 2.281(a).

Thus, under Interior's regulations, Hawkins and Lake should have been allowed to testify "as private citizens as to facts or events that are not related to the official business of the Department." *Id.* § 2.280(c)(5). This would have been no problem for Hawkins, who did not work for the BIA at the relevant time when he made the observations about which he proposed to testify. While Lake was a BIA employee when he observed the relevant events, his testimony did not concern his work at BIA, but rather information about USDA, where he was not employed. It is not here clear whether Lake secured this information as a result of his BIA employment. Under these circumstances, it may be that the regulations would not prevent Lake from testifying or, even if they did, that the government could not properly invoke them here. We leave this issue to the Claims Court on remand. In any case, testimony from a single witness (Hawkins) would have been sufficient under the Agreement.

Next, the government argues that its actions could, at most, be considered harmless error. In denying Mr. LaBatte's claim, the Neutral Administrator wrote

> The evidence you submitted on this issue, the declaration of your attorney, Erick G. Kaardal, runs afoul of the Settlement Agreement's requirement that evidence on this issue, and on the issue of whether you had filed a complaint of discrimination with USDA, has been established, "by a credible sworn statement based on personal knowledge by an individual who is not a member of the Claimant's family." (Settlement Agreement IX.D.2.a). Since Mr. Kaardal's declaration makes clear that you obtained the information in the dec-

laration from the two federal officials named, the Settlement Agreement's requirements have not been met. Further, the statements in that declaration purporting to establish that white farmers received a benefit (loans) that you were denied, lack the specificity necessary to establish that those benefits were, in fact received by the white farmers.

J.A. 173–74. The government concludes from this that the government's actions, even if wrongful, were harmless, because the actual declarations of Hawkins and Lake would have been insufficient even if they had been signed.

We first note that the Neutral evidently rejected the Hawkins and Lake declarations because they were not signed, and then focused on the Kaardal Declaration (Mr. LaBatte's lawyer), rejecting it for not being based on personal knowledge. The Neutral here only found that the statements in "that declaration [i.e., the Kaardal Declaration] lacked the required specificity." J.A. 174. Even if one can assume that the same specificity objection would have been applied to the Hawkins and Lake declarations if they had been signed, Mr. LaBatte's complaint makes clear that the declarations were supposed to contain more information and would have been revised, updated, and signed, had the government not prevented Lake and Hawkins from cooperating.

Mr. LaBatte alleges that "[b]oth witnesses, former Tribal Chair Hawkins and Lake had agreed to provide *complete* testimony and sign declarations on LaBatte's behalf for his Track B process claim." J.A. 74 (emphasis added). Mr. LaBatte makes clear that the "declarations for former Tribal Chair Hawkins and Lake were" unfinished "drafts" that were "prepared for review, revision, and ultimately execution." J.A. 64. Mr. LaBatte has alleged that, but for the government's interference, he would have been able to submit more detailed, and more

specific, signed declarations. Such review and revision, for example, could have provided more specificity concerning whether the named white farmers were similarly situated, what loans those farmers received, and what dates they received the loans. Given this, the government's actions cannot be considered harmless error.

The government also argues that if Mr. LaBatte prevails on his claims before the Claims Court, there is still no possible remedy since the Keepseagle Settlement program has been terminated. We are confident that if, after further proceedings, the Claims Court finds that there was a breach, the court will be able to decide on an appropriate remedy to provide Mr. LaBatte what he would have received in the Track B process absent the breach. The Claims Court may consider whether reconstituting the Track B process for Mr. LaBatte is an appropriate or necessary step in arriving at such a remedy.

## CONCLUSION

We conclude that Mr. LaBatte has stated a claim for relief that falls within the subject-matter jurisdiction of the Claims Court.

**REVERSED AND REMANDED**