ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Goodloe Marine, Inc. | ) ASBCA Nos. 62106, 62446 |
| | ) |
| Under Contract No. W9126G-18-C-0071 | ) |

APPEARANCES FOR THE APPELLANT:   Michael H. Payne, Esq.
   Cohen Seglias Pallas Greenhall & Furman PC
   Philadelphia, PA

   Casey J. McKinnon, Esq.
   Cohen Seglias Pallas Greenhall & Furman PC
   Washington, DC

APPEARANCES FOR THE GOVERNMENT:   Michael P. Goodman, Esq.
   Engineer Chief Trial Attorney
   Clark Bartee, Esq.
   Engineer Trial Attorney
   U.S. Army Engineer District, Galveston

OPINION BY ADMINISTRATIVE JUDGE MELNICK GRANTING
THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

Appellant, Goodloe Marine, Inc., of Wimauma, Florida (Goodloe), was awarded a contract to perform pipeline dredging by the United States Army Corps of Engineers (Corps or government). The government eventually terminated Goodloe for default for failing to dredge at the required production rate. Goodloe appeals from the default, as well as from a denial by the government of its claim for additional time it alleges should be recognized due to weather delays. The government has moved for summary judgment, which we grant.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

I.      Undisputed Facts

The following facts have not been shown to be in genuine dispute.

1. On September 29, 2018, the government awarded the firm fixed-price contract identified above to Goodloe. The contract was for pipeline dredging of the Gulf Intracoastal Waterway around Galveston, Texas. The contract estimated that 630,000 cubic yards of material would be removed. (R4, tab 1 at 4-10, tab 2) Among

the standard Federal Acquisition Regulation (FAR) clauses incorporated by reference was FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) (R4, tab 1 at 16). In addition to that provision, the contract contained section 3.1.3, entitled "Default Terms." It provided that:

> Failure of the Contractor to comply with the requirements of the Contract will be grounds for a determination, by the Contracting Officer, that the Contractor is not prosecuting the work with sufficient diligence to ensure completion within the time specified in this Contract. Upon making this determination, the Contracting Officer may terminate the Contractor's right to proceed with the work, or separable parts of it, in accordance with the default terms of the Contract.

(R4, tab 1 at 173)

2. The contract required Goodloe to begin performing 10 calendar days after receiving a notice to proceed and complete performance 130 calendar days later. The government issued the notice to proceed on October 17, 2018, establishing February 24, 2019, as the contract completion date. (R4, tab 1 at 8, tab 3)

3. The contract imposed strict capacity requirements upon Goodloe. Section 1.15.2 mandated that "[t]he effective production rate of the dredge plant shall not be less than 360,000 cubic yards per month" and "[n]o reduction in the capacity of the dredge equipment and attendant plant employed to execute the work is to be made except by written direction of the Contracting Officer." The capacity would be measured from actual performance. (R4, tab 1 at 133) Dredging 360,000 cubic yards per month (30 days) requires an average of 12,000 cubic yards per day.

4. To achieve the contract's requirements, Goodloe informed the government during a pre-award survey that it intended to use two dredges. One was *Bettie G* and the other was *Perseverance.* (Gov't statement of undisputed material facts ¶ 2; app. resp. ¶ 2) Goodloe said that *Bettie G*'s average production rate ranged between 6,000 and 8,000 cubic yards per day. Goodloe stated that *Perseverance* could achieve between 8,000 and 10,000 cubic yards per day. Goodloe also noted that it had a third dredge, *Reliable*, available to assist if necessary to complete performance on time. Goodloe represented that all three dredges were sitting idle at its yard and could be moved within days to the project site once it received a notice to proceed. Goodloe confirmed that it understood that the minimum amount of material that had to be dredged in a month was 360,000 cubic yards. It represented that *Bettie G* would start dredging about 21 days after the notice to proceed and *Perseverance* would arrive about

two to three weeks later and dredge concurrently with *Bettie G* at a rate that would achieve the minimum production. (R4, tab 349 at 1409, 1411, tab 350 at 1420)

5. The record contains a series of forms purporting to be Goodloe's Contractor Quality Control (QCR) Reports. However, no author is identified and their certification lines are blank. Beginning with the form dated November 6, 2018, a series of them indicate that Goodloe encountered weather delays on a total of 30 different days between October 18 and December 29, 2018. Many of the forms attached calendars for October, November, and December 2018 that also supposedly show the reported adverse weather. The calendars appear to be from an internet weather application ("app"), but Goodloe does not identify the source. There is also no indication of the geographical location they purport to describe, except the December calendar is marked Bay City, Texas. We judicially notice that location is over 70 miles on a straight line from Galveston.[1] (R4, tabs 196, 198, 200, 202, 204, 212, 214, 227, 237, 239, 241, 243, 257, 275, 277, 281, 283, 293, 295, 297, 301, 303, 305, 307)

6. Goodloe began dredging on December 17, 2018, with *Bettie G.* (R4, tab 220; gov't statement of undisputed material facts ¶ 15; app. resp. ¶ 15; app. supp. R4, tab 30 (Native) at 1391 (production rate tab)).

7. On January 10, 2019, the government sent a letter of concern to Goodloe's president in Florida regarding its ability to timely complete the contract. The government indicated that Goodloe's average dredging rate of 2,011 cubic yards per day had placed it three weeks behind schedule and was unacceptable. The government directed Goodloe to submit an updated schedule by January 15, 2019. (R4, tab 170)

8. Goodloe's president, Ms. Bettie Goodloe, responded to the government on January 15, 2019. She indicated that Goodloe had experienced "weather days" and "vendor delays" that delayed the arrival of *Bettie G* and *Perseverance* to the site. She stated that Goodloe had provided documentation of the weather, and expressed the belief that the conditions Goodloe encountered justified a later completion date. She also represented that *Perseverance* would arrive on or about January 22, 2019. (R4, tab 161)

9. On February 11, 2019, the contracting officer issued a show cause notice to Goodloe notifying it that the government was considering terminating the contract for default. The government observed that *Bettie G* did not start dredging until December 17, 2018, 65 days after the notice to proceed. *Perseverance* did not arrive until January 23 and experienced operational problems. Goodloe's invoice for December 15, 2018 through January 23, 2019, showed less than 35,000 cubic yards removed, well below the contractual requirement. (R4, tab 101)

---

[1] *See* FED. R. EVID. 201.

10. Goodloe responded to the show cause letter on February 15, 2019. Goodloe stated that it had been delayed by weather since the notice to proceed. It characterized the amount of rainfall during the previous several months as unusual, saying anyone who lives or works in the area knows that. It explained that the conditions had hampered its assembly and placement of pipelines, emphasizing its delays commenced before dredging began. Goodloe also represented that other Corps projects in the area had been delayed by weather and that the government's survey party had declined to work on Goodloe's project due to weather on two occasions. It also stated that it had recently been delayed for two days by fog. Goodloe did not deny the rate of production indicated by the contracting officer. (R4, tab 94)

11. Goodloe attached to its show cause response more weather app calendars for October 2018 through January 2019. This second set appears to be from The Weather Company and describes the weather differently for many of the days than the calendars Goodloe submitted previously with the purported QCR reports (R4, tabs 94, 237). As before, Goodloe did not identify the geographical location the calendars are meant to describe, other than to vaguely declare they are "for the area closest to our work." Goodloe claimed it was delayed by weather for 40 days and by an additional lock delay caused by the Corps of one and a half days. (R4, tab 94 at 653-56)

12. Goodloe also provided three purported news articles with its show cause response describing another project. The first two look to have come from a website called Dredgewire and are dated prior to the award of this contract. One stated that the Corps expected to dredge the San Jacinto River's West Fork the week of September 17, 2018, weather permitting. The article implied that weather had previously delayed commencement of the project. (R4, tab 94 at 658) Another reported that the project actually began September 21, repeating the reference to prior weather delays (*id.* at 660). The third "article," dated November 5, 2018, is just text with no indication that it was published anywhere. It repeated that the San Jacinto river project began on September 21 after experiencing the weather delays. (*Id.* at 662)

13. Goodloe's show cause response also admitted that *Perseverance* was delayed arriving on site because of continuing dry dock repairs that Goodloe started after the dredge was sunk by Hurricane Harvey. We judicially notice that storm struck Texas and Louisiana in August 2017, over a year before this contract was awarded. Goodloe blamed its insurance company and a hydraulic expert for overlooking damage requiring significant time to repair. (R4, tab 94)

14. Goodloe continued to dredge after the February 24, 2019 period of performance expired. *Perseverance* began dredging on either March 6 or 7, 2019. (R4, tab 52; app. supp. R4, tab 30 (Native) at 1391 (production rate tab))

15. In late March 2019, Goodloe issued a payment invoice to the government for work performed between February 21 and March 19, 2019. According to the government payment estimate (Pay Estimate No. 5) associated with that invoice, Goodloe had earned $1,494,873.50 of the $3,782,500 contract price, or 39.5%. (App. supp. R4, tab 8)

16. On March 28, 2019, the contracting officer terminated the contract for default on the ground that Goodloe had failed to perform in accordance with the contract schedule at a production rate of 360,000 cubic yards per month. He stated that work was 39.5% complete. (R4, tab 23) In determining whether to terminate, the contracting officer considered the factors contained in FAR 49.402-3(f) and documented that review in a Termination for Default checklist signed March 28, 2019 (R4, tab 25). The checklist noted the work was essential, that Goodloe was given every opportunity to complete it, but that it had not maintained the required production rate. The checklist observed that Goodloe dredged less than 35,000 cubic yards between December 15, 2018 and January 23, 2019. Regarding the urgency of the services and the time required to obtain them from another source, the checklist stated that the channel to be dredged is shallow and requires timely dredging for navigation. The services would be sought in an upcoming project to ensure completion during the 2019 fiscal year. An earlier draft of the checklist from March 22, 2019, indicated that no market research had been performed. (*Id.*; app. supp. R4, tab 7 at 47)

17. Goodloe has appealed the termination, which has been docketed as ASBCA No. 62106.

18. After terminating the contract, the government performed a survey that showed Goodloe had dredged a total of 268,996 cubic yards of material, which is 43% of the 630,000 cubic yards the contract estimated would be removed (R4, tab 1 at 10; app. supp. R4, tab 29 at 1385). The survey indicated that between March 20 and March 28, 2019, the date of termination, Goodloe dredged 45,000 cubic yards (app. supp. R4, tab 29 at 1385). Thus, at the time of termination Goodloe was still not achieving a rate equal to 360,000 cubic yards per month.[2] An April 2019 government engineer spreadsheet states that *Bettie G*'s production was 20,388 cubic yards in December 2018; 61,462 cubic yards in January 2019; 49,012 in February; and 94,184 in March. *Perseverance* only dredged in March 2019, producing 60,233 cubic yards.[3] Goodloe's average monthly production with combined dredges was 128,452 cubic yards, and its highest monthly production was 154,417. The report presented three possible scenarios had performance continued. The most reasonable scenario

---

[2] Dividing 8 days into 45,000 cubic yards equals 5,625 cubic yards. As already noted, 360,000 cubic yards per month requires an average of 12,000 cubic yards per day.

[3] These numbers add up to 285,279 cubic yards.

was based upon Goodloe's average production using two dredges, with Goodloe dredging 297,146 cubic yards over 71 additional days. In the best case scenario for Goodloe, it would maintain its highest reported production rates on both dredges and require 60 more days to dredge the same amount. Under the least reasonable scenario, Goodloe would only dredge 181,457 cubic yards in 44 days. This last scenario was not considered very reasonable because of high shoaling rates and the likely requirement that Goodloe would have to re-sweep the area. (App. supp. R4, tab 30 (Native) at 1391 (survey tab))

19. The parties engaged in some communications following the termination. An April 10, 2019 letter from Goodloe's surety to the contracting officer claimed that at the time of termination the project was approximately 30 days from completion (app. supp. R4, tab 12). A June 5, 2019 letter to the contracting officer from the surety's counsel sought Goodloe's reinstatement. It indicated Goodloe might be able to retain help from another contractor and together dredge an average of 6,378.2 cubic yards per day, or 191,346 per month. This is only slightly more than half of the 360,000 cubic yards the contract required. Retreating from the surety's April prediction that the job could be completed in 30 days, the letter said that at this rate the project would finish in 48 days, implying that approximately 306,000 cubic yards remained to be dredged. The surety provided no details about the capabilities of the second contractor's dredge and conditioned its participation upon scheduling. (App. supp. R4, tab 22 at 180) The letter's next paragraph continued that even if the second contractor did not participate, Goodloe could proceed using only *Perseverance* and achieve an average rate of 3,400 cubic yards per day, or 102,000 per month. This is obviously far below Goodloe's prior representation that *Perseverance* could achieve between 8,000 and 10,000 cubic yards per day, and is less than a third of the contract's 360,000 cubic yard monthly requirement. Anyway, where the prior paragraph had implied that 306,000 cubic yards remained to be dredged, here that number abruptly changed to 198,000 cubic yards. The letter claimed that the job could be completed in 74 days, including mobilization and demobilization.[4] (*Id.*)

20. The government concluded that the surety's proposal was not in the government's best interest. It noted the uncertainty of the surety's projected completion times ranging between 30, 48, and 74 days. (App. supp. R4, tab 33 at 1401)

21. On December 5, 2019, the contracting officer received a claim from Goodloe asserting that it had experienced weather delays performing the contract, entitling it to a time extension of 41.5 days (R4, tabs 6, 12).

---

[4] According to the letter, 240,000 remaining cubic yards "was discussed" by someone. It says survey information supplied to the surety by Goodloe "suggests that the number is approximately 198,000."

6

22. A February 2020 government engineer report notes that there were several days when weather delayed government acceptance of surveys, which then delayed Goodloe's advancement to the next dredging section (app. supp. R4, tab 24 at 768).

23. On March 19, 2020, the contracting officer denied Goodloe's claim for a time extension (R4, tab 6). Goodloe has appealed that decision which was docketed as ASBCA No. 62446 and consolidated with ASBCA No. 62106.

24. On September 28, 2020, the government awarded a replacement contract to complete the remaining work on the project. The new contractor mobilized to the site in November 2020, with completion required by July 13, 2021. (App. supp. R4, tab 33 at 1398-99)

II.     Status of the Proceedings

Goodloe's amended complaint in ASBCA No. 62106 alleges that it was wrongfully terminated because it experienced delays caused by unforeseeable weather. It also maintains that the project was near completion at the time of termination, that the government did not properly consider the factors contained in FAR 49.402-3(f), and that it failed to consider alternatives to termination. Alternatively, Goodloe essentially contends that for the same reasons the government breached the implied covenant of good faith and fair dealing. Goodloe's complaint in ASBCA No. 62446 seeks a time extension of 41.5 days to account for the weather delays.

The government moves for summary judgement, claiming that the undisputed facts show that its termination for default was justified and Goodloe's delay was not excusable. In its effort to defeat summary judgment, Goodloe provided Ms. Goodloe's declaration. Ms. Goodloe testifies that she was involved with and aware of Goodloe's work. She states that Goodloe "was inhibited by weather-related delays, which delayed the arrival of certain Goodloe equipment and prevented Goodloe from proceeding with the work as planned." She does not identify the equipment but elaborates that Goodloe encountered "rain, high winds, fog and extremely low tides resulting from high winds." Ms. Goodloe also says that the delays were discussed with the government project engineer and Goodloe "documented the weather delays in daily reports with supporting documentation from weather station data for the relevant dates." She adds that Goodloe's quality control reports provided notice to the government of the weather delays. Ms. Goodloe explains that dredging projects are susceptible to delays from weather-related issues, including, but not limited to, rain, wind, fog and high and low tides. (App. resp., ex.)

7

<u>DECISION</u>

I.      Summary Judgments Standards

Summary judgment before the Board is guided by Federal Rule of Civil Procedure 56.  Board Rule 7(c)(2).  Under Rule 56, summary judgment should be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A non-movant seeking to defeat the suggestion that there are no genuine issues of material fact may not rest upon its pleadings, but "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

When ruling upon a summary judgment motion, we must construe the evidence in the light most favorable to the non-movant and draw all reasonable inferences in its favor.  *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994).  However, summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322-23.  Thus, the moving party need not offer evidence showing the absence of a genuine issue of material fact regarding an issue on which the non-moving party bears the burden of proof.  It must only point out to the Board that there is an absence of such evidence to shift the burden to the non-movant to offer evidence establishing a genuine issue for trial.  *Id.* at 325; *DJ Mfg. Corp. v. United States*, 86 F.3d 1130, 1135 (Fed. Cir. 1996); *Dairyland Power Co-op.*, 16 F.3d at 1202; *Homeland Housewares*, *LLC v. Sorensen Research and Dev. Trust*, 581 F. App'x 869, 874 (Fed. Cir. 2014).

II.     Goodloe's Unexcused Default

The government premises its motion for summary judgment upon the fact that Goodloe did not meet the requirement that it dredge 360,000 cubic yards per month.  It also relies upon Goodloe's failure to complete the project by the contract's February 24, 2019, deadline.  It contends that either of these grounds support sustaining the termination.

The contract's default clause permitted termination if Goodloe did not complete the work on time.  FAR 52.249-10(a); *see Watts Constructors*, *LLC*, ASBCA Nos. 61518, 61961, 19-1 BCA ¶ 37,382 at 181,724; *see also Truckla Servs.*, *Inc.*, ASBCA Nos. 57564, 57752, 17-1 BCA ¶ 36,638 at 178,445 ("Failure to complete the contract work is a *prima facie* basis for a default termination"), *aff'd*, 730 F. App'x 926 (Fed. Cir. 2018).  Having

8

shown that Goodloe failed to finish by the contract's February 24, 2019 deadline, the government has established that as a basis for termination (SOF ¶¶ 14, 18).[5]

Regarding the government's reliance upon Goodloe's failure to dredge 360,000 cubic yards per month, section 3.1.3 of the contract permitted the government to terminate for default if Goodloe's performance did not comply with the contract's requirements (SOF ¶ 1). The contract expressly stated that the effective production rate of the dredge plant was to be no less than 360,000 cubic yards per month and no reduction to the capacity of the dredge equipment and attendant plant employed was to be made except by written direction of the contracting officer (SOF ¶ 3). Goodloe commenced dredging on December 17, 2018, but only with *Bettie G* (SOF ¶ 6). *Perseverance* did not arrive on site until January 23, 2019, and it was not operational until early March (SOF ¶¶ 9, 14, 18). *Bettie G* was incapable of dredging 360,000 cubic yards per month and did not do so for the more than two months that it was the only operational dredge on site (SOF ¶¶ 4, 7, 9, 16, 18). Accordingly, the government has carried its burden to establish that Goodloe did not meet the contract's requirement for an effective dredge plant production rate of 360,000 cubic yards per month.[6]

Goodloe's failure to comply with the contract's requirements does not entirely end our inquiry because Goodloe's right to proceed could not be terminated if it was delayed due to unforeseeable causes beyond its control and without its fault or negligence. FAR 52.249-10(b)(1). One of the express examples of excusable delay contained in the default clause is unusually severe weather. FAR 52.249-10(b)(1)(x). Goodloe says that during performance it encountered rain, high wind, fog and extremely low tides that delayed its work. Goodloe bears the burden to show that its nonperformance due to unusually severe weather was excusable. *Bell Constr. Co.*, ASBCA No. 23376, 79-2 BCA ¶ 13,908 at 68,272. To establish a time extension for unusually severe weather, Goodloe must: (1) identify work controlling overall completion; (2) show this controlling work was delayed by the weather, and (3) prove the weather was unusually severe. *Skip Kirchdorfer, Inc.*, ASBCA Nos. 40515, 43619, 00-1 BCA ¶ 30,622 at 151,168; *Bell Constr. Co.*, 79-2 BCA ¶ 13,908 at 68,272-73.

It was not the weather that prevented Goodloe from having a dredge plant production capacity of not less than 360,000 cubic yards per month. The record shows

---

[5] It does not matter that the termination notice did not specifically refer to late completion as its reason. The Board sustains a default if justified by the circumstances at the time of termination regardless of whether the government removed the contractor for another reason. *Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1357 (Fed. Cir. 2004) (quoting *Kelso v. Kirk Bros. Mech. Contractors, Inc.*, 16 F.3d 1173, 1175 (Fed. Cir. 1994)).

[6] Indeed, even when both dredges were operating at the time of termination, Goodloe was still failing to meet the required production rate (SOF ¶ 18).

that *Perseverance* failed to dredge prior to March of 2019 because it was undergoing continuing repairs necessitated by Hurricane Harvey, followed by operational problems on site (SOF ¶¶ 9, 13-14, 18). *Perseverance*'s delay due to damage caused by a hurricane occurring over a year before award is not an excusable weather event. When Goodloe assured the government during the pre-award survey that it would meet the 360,000 cubic yard requirement using *Perseverance*, which it also said could travel to the project site within days of the notice to proceed, it was in fact proposing a damaged, inoperable dredge. (SOF ¶¶ 4, 13) *Perseverance*'s inability to perform was anything but unforeseeable. Furthermore, contractors generally assume the risk of providing the necessary equipment to perform and equipment breakdowns do not excuse performance failure.[7] *E.g.*, *Commercial Contractors Equip., Inc.*, ASBCA No. 52930 *et al.*, 03-2 BCA ¶ 32,381 at 160,262-63; *Naughton Energy, Inc.*, ASBCA No. 33044, 88-2 BCA ¶ 20,800 at 105,073. Regardless of the weather on site between December of 2018 and March of 2019, only *Bettie G* was capable of dredging and it lacked the capacity to remove 360,000 cubic yards per month, as required by the contract. Goodloe has not shown a nexus between the weather and its default. *See TRU & Assocs., Inc.*, ASBCA No. 45263, 96-2 BCA ¶ 28,389 at 141,785-86 (finding the default upon a coal supply contract not excused for unusually severe weather when the contractor failed to show that absent the inclement weather it would have been able to perform); *Fox-Sadler Co.*, ASBCA No. 8421, 1963 BCA ¶ 3768 at 18,795 (disregarding evidence of unusually severe weather when it was not the cause of late performance).

Even if we were to disregard *Perseverance*'s failure to provide the necessary dredge capacity, the government has pointed to an absence of evidence supporting Goodloe's allegation that the project was excusably delayed for 41.5 days due to unusually severe weather. Because Goodloe would bear the burden of proving that excuse at trial, to defeat summary judgment Goodloe must make a showing establishing a genuine issue for trial.

"Unusually severe weather must be construed to mean adverse weather which at the time of year in which it occurred is unusual for the place in which it occurred." *Broome Constr., Inc. v. United States*, 492 F.2d 829, 835 (Ct. Cl. 1974). No matter how severe or destructive the weather may have been, if it was not unusual for the time and place no relief is justified. *Bigelow, Inc.*, ASBCA No. 24376, 81-2 BCA ¶ 15,300 at 75,737; *see also Cape Ann Granite Co. v. United States*, 100 Ct. Cl. 53, 72 (1943) (no relief when work was exposed to severe storms but they were not more severe than ordinarily encountered); *Aulson Roofing, Inc.*, ASBCA No. 37677, 91-2 BCA ¶ 23,720 at 118,730 ("Excusable delay will be found only where the weather experienced was unusually severe as compared to the past weather at the same

---

[7] It is also worth observing that Goodloe represented to the government that *Reliable* was available to assist if necessary (SOF ¶ 4). Goodloe offers no explanation as to why it was not employed in the absence of *Perseverance*.

location for the same time of year"). Weather records establish what is normal and foreseeable weather. *Skip Kirchdorfer*, 00-1 BCA ¶ 30,622 at 151,168. Excusable delays are then determined by comparing the weather experienced to the historic weather. *DayDanyon Corp.*, ASBCA No. 57681, 15-1 BCA ¶ 36,073 at 176,151, *aff'd*, 673 F. App'x 997 (Fed. Cir. 2017). Merely offering evidence of a number of rainy, windy, foggy, or low tide days proves nothing if it is not shown to exceed a historical norm. Assuming Goodloe has made a sufficient showing that it was delayed because of severe weather, it has not presented any evidence that it was more severe than the norm.[8] It has not provided any evidence of the historic weather for the time and place of the project for comparison to what occurred.[9] Accordingly, Goodloe has not made a sufficient showing to defeat the government's motion for summary judgment upon its claim that its default is excused (or that it is entitled to extra time) due to unusually severe weather.

---

[8] It is questionable whether Goodloe has made a showing that it was delayed for over 40 days due to weather. Ms. Goodloe's declaration does not expressly state that she has first-hand knowledge of the weather Goodloe encountered or witnessed herself how it impaired Goodloe's work on any particular day (app. resp., ex.). *See* FED. R. CIV. P. 56(c)(4) (requiring that an affidavit or declaration used to support or oppose a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated); *Raytheon Co.*, ASBCA No. 61859, 20-1 BCA ¶ 37,630 at 182,688. The QCR reports are unsigned and Goodloe has failed to otherwise identify an author possessing personal knowledge of the information they purport to convey. The first set of Goodloe's graphical weather calendars do not identify their source, and with the exception of the December calendar's mention of a city over 70 miles from the project area, fail to identify the place they are describing. (SOF ¶ 5) The second set of calendars also fail to identify the relevant location (SOF ¶ 11). Goodloe's purported newspaper articles about a Corps dredging project in the San Jacinto River before the award of this contract are irrelevant (SOF ¶ 12). However, Goodloe has presented a 2020 government engineer report observing that weather delayed its advancement to new dredging sections for some unspecified number of days (SOF ¶ 22).

[9] Goodloe's assertion in response to the government's show cause order that anyone who lives in the area knows the weather had been unusual is unsupported and conclusory and is therefore inadequate to overcome summary judgment (SOF ¶ 10). *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1112 (Fed. Cir. 2000); *see also Raytheon Co.*, 20-1 BCA ¶ 37,630 at 182,688.

III.     The Record Does Not Support Goodloe's Contention That the
         Termination Was Arbitrary, Capricious, or an Abuse of Discretion

Goodloe next argues that even if it was in default, the government's motion should be denied because it has presented evidence the contracting officer was arbitrary and capricious terminating it. It suggests the government was materially in error believing the project was only 39.5 percent complete and relying upon Goodloe's less than 35,000 cubic yards of production between December 15, 2018 and January 23, 2019 (SOF ¶¶ 9, 16). It stresses that Goodloe dredged 154,417 cubic yards in March and a total of 268,996 at the time of termination, implying that should have been enough (SOF ¶ 18). It also contends the government was wrong to conclude that Goodloe would need 74 more days to complete the project.[10] Goodloe says the default was an abuse of discretion because only a small amount of work remained, the government failed to conduct market research into its alternatives if it terminated, and the government's statements about the urgency of the work are contradicted by its actions. Goodloe argues *Darwin Construction Co. v. United States*, 811 F.2d 593 (Fed. Cir. 1987), supports the conclusion that the totality of these facts show bad faith and abuse of discretion by the government.

A default termination can be set aside if the government abuses its broad discretion to terminate. *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999). More specifically, default may not be invoked by the government as a pretext for reasons unrelated to performance. *Id.* at 1329. To find that a default termination reflects an abuse of discretion because it was based upon materially erroneous information normally requires bad faith. This in turn requires a showing with convincing clarity of a high probability of personal animus by the contracting officer with a specific intent to injure. *Watts Constructors*, 19-1 BCA ¶ 37,382 at 181,728. Regardless of whether Goodloe's progress was 39.5, 43, or some other percentage, or that it dredged varying amounts of materials in different months, it failed to maintain a dredging capacity of 360,000 cubic yards per month and failed to complete performance by the contract completion date. There is nothing erroneous about these facts, much less anything about them to indicate animus by the government with a specific intent to injure Goodloe.

Goodloe suggests the default was still unsustainable because, had it been allowed to continue, it would have consistently dredged 10,000 cubic yards per day and finished in 18 days. Goodloe has not supported that contention and has not shown

---

[10] The evidence cited by Goodloe does not support its contention that the government concluded it would take Goodloe 74 more days to complete the project. It shows that the government rejected Goodloe's proposal (made through its surety's counsel) for reinstatement as not being in its best interest because Goodloe's estimated completion time ranged between 30, 48, and 74 days (app. supp. R4, tab 33 at 1400-01).

that it ever demonstrated that possibility to the contracting officer.[11]  In fact, through counsel, Goodloe's surety made very different representations on Goodloe's behalf while seeking its reinstatement.  After abandoning an initial prediction that Goodloe could complete the job in 30 days, it informed the contracting officer the work could not be finished in less than either 48 or 74 days.  The 48 days were dependent upon the uncertain employment of another dredge.  Neither scenario had Goodloe dredging the contractually required 360,000 cubic yards per month.  (SOF ¶ 19)  Similarly, the government's post-termination analysis ranged between 44 days under the least reasonable scenario and 71 under the most reasonable one (SOF ¶ 18).  The contracting officer rejected the surety's request to reinstate Goodloe, noting the uncertainty of its projections (SOF ¶ 20).  Again we see no indication of error by the contracting officer regarding the evidence before him and certainly no animus by him with a specific intent to injure Goodloe.

Goodloe also objects to the answers the contracting officer recorded for two of the factors he was to consider under FAR 49.402-3(f) when deciding whether to terminate for default.  Specifically, in response to FAR 49.402-3(f)(3)-(4)'s inquiry into the availability of the contract's services from others, their urgency, and the period of time necessary to obtain them, he said the requirement would be included in a future project for completion in the 2019 fiscal year.  Goodloe complains that the government did not perform any market research that would support these statements and it did not compare the time an alternative contractor might take to the time Goodloe would need to finish performance.

The nature of the government's compliance with FAR 49.402-3(f) may aid our inquiry into whether the government has abused its discretion terminating the contract, but it confers no rights upon Goodloe and the contracting officer's failure to consider one or more of its factors does not dictate disturbing a default termination.  *DCX*, *Inc. v. Perry*, 79 F.3d 132, 135 (Fed. Cir. 1996).  Goodloe cites no authority stating that the contracting officer must perform a market research study to address the relevant provisions of FAR 49.402-3(f).  Though the answers given by the contracting officer to these questions about the government's options lacked specifics, that does not show the termination was a mere pretext.

Finally, Goodloe contends that *Darwin Construction* dictates that the totality of the evidence presented proves bad faith.  In *Darwin*, the Board found that the

---

[11] The best we can discern is that Goodloe is relying upon a government report showing that on March 16, 2019, which was one out of the 23 days that its two dredges worked, their combined production exceeded 10,000 cubic yards (app. supp. R4, tab 30 (Native) at 1391 (production rate tab)).  This one day does not evidence that it would have achieved that rate every day into the future, or that it would have completed the dredging in 18 days if it had.

contractor was not terminated because it failed to timely complete the project, but simply to enable the government to be rid of dealing with it. That was held to be arbitrary and capricious. The court of appeals affirmed, stressing its conclusion was based upon the Board's finding that the government had used the default as a pretext to terminate. *Darwin*, 811 F.2d at 596. The court of appeals has since elaborated that the lesson of *Darwin* and related decisions is that a termination for default unrelated to contract performance is arbitrary and capricious and therefore an abuse of discretion. *McDonnell Douglas Corp.*, 182 F.3d at 1326. However, there is no abuse of discretion when there is no evidence of bad faith by the contracting officer; there is a reasonable, contract-related basis for his decision; he has not exceeded his discretion; and he has not violated any applicable statutes or regulations. *Id.*; *see also Third Coast Fresh Distribution*, *L.L.C.*, ASBCA No. 59696, 16-1 BCA ¶ 36,340 at 177,194.

We have already confirmed the contract-related basis for Goodloe's default termination. There is no reason to conclude that it contravenes any statutory or regulatory restrictions. Goodloe's complaints about weather delays, the time remaining to finish, and the absence of market research have been rejected and do not establish bad faith or abuse of discretion. Still, Goodloe suggests it is the victim of the contracting officer's bad faith because it was terminated and replaced by a contractor whose services could not be obtained until after Goodloe might have finished the job had it been retained. The undisputed facts belie that contention. Goodloe represented to the government that it would use a dredge that it knew was unavailable to perform its contractual obligations, then failed to perform as required without an excuse, blaming its deficiencies upon unusual weather without evidence. Against this backdrop, Goodloe's suggestion that it was an abuse of discretion not to allow it to dredge to completion anyway, after the contract completion date expired, and at a rate of its own choosing below the contract's 360,000 cubic yard per month mandate, is unfounded.

### IV. The Record Does Not Support a Breach of the Covenant of Good Faith and Fair Dealing

Goodloe's alternative theory suggesting the facts amount to a breach of the covenant of good faith and fair dealing does not save it.[12] The duty of good faith and fair dealing prohibits "interference with or failure to cooperate in the other party's performance." *LaBatte v. United States*, 899 F.3d 1373, 1379 (Fed. Cir. 2018) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (1981)). The duty binds each party not to act to destroy the reasonable expectations of the other party regarding the fruits of the contract. However, the duty does not expand a party's obligations beyond

---

[12] Goodloe contends that the government's motion for summary judgment is only a partial motion that does not encompass its good faith and fair dealing claim. Nothing in the motion restricted its scope.

the contract's express terms or establish responsibilities inconsistent with the contract's provisions. Thus, a party must undermine a specific promise to breach the duty. *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 1106 (2020). As already explained, the government was contractually entitled to terminate Goodloe when it defaulted upon its obligations. Because none of Goodloe's arguments purporting to excuse its default have merit, or otherwise undercut the termination's validity, there is no basis for concluding the government breached its implied obligations by exercising its contractual right to terminate for default.

CONCLUSION

The government's motion for summary judgment is granted. The appeals are denied.

Dated: January 27, 2022

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

15

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62106, 62446, Appeals of Goodloe Marine, Inc., rendered in conformance with the Board's Charter.

Dated:  January 27, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals